Lu V. MALPIEDE, Neil Malpiede, Julie S. Karchin, JJL Partners, Mary Jane Howard, and Roger H. Papazian, Plaintiffs Below, Appellants,

v.

George W. TOWNSON, Richard O. Starbird, Hugh W. Hunter, William J. Barrett, Merle A. Johnston, Royalty Acquisition Corp., Royalty Corporation, and Knightsbridge Capital Corporation, Defendants Below, Appellees.

No. 80, 2000.

Supreme Court of Delaware.

Submitted: * April 3, 2001.
Decided: Aug. 27, 2001.

---

* The Court heard argument in this matter on April 3, 2001 but postponed its final decision until the issuance of the mandate in *Midland Food Services, LLC v. Castle Hill Holdings V, LLC*, Del.Supr., No. 509, 1999, 2001 WL 760862, Veasey, C.J. (June 15, 2001) (ORDER), on July 3, 2001, due to any possible relevance *Midland* might have on the Rule 12(b)(6) issue in this case (discussed *infra* at pages 1080–1095).

Norman M. Monhait, Esquire (argued), of Rosenthal Monhait Gross & Goddess, P.A., Wilmington, Delaware; Of Counsel: Goodkind Labaton Rudoff & Sucharow LLP, New York, New York; Lowey Dannenberg Bemporad & Selinger, P.C., White Plains, New York; Law Offices of Jeffrey S. Abraham, New York, New York; Hanzman Criden Korge Chaykin Ponce & Heise, P.A., Miami, Florida; Schubert & Reed, LLP, San Francisco, California; Cohn Lifland Pearlman Herrmann & Knopf, Saddle Brook, New Jersey, for Appellants.

William D. Johnston, Esquire (argued), John W. Shaw, Esquire, and Danielle B. Gibbs, Esquire, of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware, for Appellees Royalty Acquisition Corp., Royalty Corp., and Knightsbridge Capital Corp.

A. Gilchrist Sparks, Esquire, Jon E. Abramczyk, Esquire (argued), and Jeffrey R. Wolters, Esquire, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, for Appellees George W. Townson, Richard O. Starbird, William J. Barrett, and Merle A. Johnston.

Stephen E. Jenkins, Esquire, of Ashby & Geddes, Wilmington, Delaware, Attorney for Appellee Hugh Hunter.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER, and STEELE, Justices, constituting the Court en Banc.

VEASEY, Chief Justice.

In this appeal, we affirm the holding of the Court of Chancery that allegations in the class action complaint challenging a merger do not support the plaintiff stockholders' claims alleging: (1) breaches of the target board's duty of loyalty or its disclosure duties; and (2) aiding and abetting or tortious interference by the acquiring corporation. We further affirm the granting of a motion to dismiss the plaintiffs' due care claim on the ground that the exculpatory provision in the charter of the target corporation authorized by 8 *Del. C.* § 102(b)(7), bars any claim for money damages against the director defendants based solely on the board's alleged breach of its duty of care. Accordingly, we affirm the judgment of the Court of Chancery dismissing the amended complaint.

With respect to the dismissal based on the exculpatory effect of the Section 102(b)(7) charter provision, we had an initial concern about the propriety of the trial court's consideration of the exculpatory charter provision on a Rule 12(b)(6) motion to dismiss because it is a matter outside the complaint. Although presentation of matters outside the pleadings required the court to convert the Defendants' motion to dismiss into a motion for summary judgment, the failure to do so was not reversible error. Because the plaintiffs do not contest the existence, terms, validity or authenticity of the Frederick's exculpatory charter provision, we hold that the charter provision was properly before the Court of Chancery, which correctly held that the plaintiffs' due care claim was barred. Accordingly, we affirm the judgment of the Court of Chancery.

*Facts*

Frederick's of Hollywood ("Frederick's") is a retailer of women's lingerie and apparel with its headquarters in Los Angeles, California.[1] This case centers on the merger of Frederick's into Knightsbridge Capital Corporation ("Knightsbridge") under circumstances where it became a target in a bidding contest. Before the merger, Frederick's common stock was divided into Class A shares (each of which has one vote) and Class B shares (which have no vote). As of December 6, 1996,[2] there were outstanding 2,995,309 Class A shares and 5,903,118 Class B shares. Two trusts created by the principal founders of Frederick's, Frederick and Harriet Mellinger (the "Trusts"), held a total of about 41% of the outstanding Class A voting shares and a total of about 51% of the outstanding Class B non-voting shares of Frederick's.[3]

On June 14, 1996, the Frederick's board announced its decision to retain an investment bank, Janney Montgomery Scott, Inc. ("JMS"), to advise the board in its search for a suitable buyer for the company. In January 1997, JMS initiated talks

1. These facts are drawn exclusively from the allegations in the plaintiffs' Consolidated Amended Class Action Complaint, filed in the Court of Chancery on October 29, 1997.

2. The amended complaint refers to the number of outstanding shares on this date without explaining the significance of the date.

3. In July 1997, The Frederick N. Mellinger Trust owned 820,193 Class A shares and 1,579,386 Class B shares. The Harriet R. Mellinger Trust owned 463,066 Class A shares and 1,579,718 Class B shares. Hugh Hunter, one of the director defendants in this case, was co-trustee of the Trusts and thus had authority to vote the Class A shares held by the Trusts.

with Knightsbridge.[4] Four months later, in April 1997, Knightsbridge offered to purchase all of the outstanding shares of Frederick's for between $6.00 and $6.25 per share. At Knightsbridge's request, the Frederick's board granted Knightsbridge the exclusive right to conduct due diligence.

On June 13, 1997, the Frederick's board approved an offer from Knightsbridge to purchase all of Frederick's outstanding Class A and Class B shares for $6.14 per share in cash in a two-step merger transaction.[5] The terms of the merger agreement signed by the Frederick's board prohibited the board from soliciting additional bids from third parties, but the agreement permitted the board to negotiate with third party bidders when the board's fiduciary duties required it to do so.[6] The Frederick's board then sent to stockholders a Consent Solicitation Statement recommending that they approve the transaction, which was scheduled to close on August 27, 1997.

On August 21, 1997, Frederick's received a fully financed, unsolicited cash offer of $7.00 per share from a third party bidder, Milton Partners ("Milton"). Four days after the board received the Milton offer, Knightsbridge entered into an agreement to purchase all of the Frederick's shares held by the Trusts for $6.90 per share.[7] Under the stock purchase agreement, the Trusts granted Knightsbridge a proxy to vote the Trusts' shares, but the Trusts had the right to terminate the agreement if the Frederick's board rejected the Knightsbridge offer in favor of a higher bid.[8]

On August 27, 1997, the Frederick's board received a fully financed, unsolicited $7.75 cash offer from Veritas Capital Fund ("Veritas"). In light of these developments, the board postponed the Knightsbridge merger in order to arrange a meeting with the two new bidders. On September 2, 1997, the board sent a memorandum to Milton and Veritas outlining the conditions for participation in the bidding process. The memorandum required that the bidders each deposit $2.5 million in an escrow account and submit, before September 4, 1997, a marked-up merger agreement with the same basic terms as the Knightsbridge merger agreement. Veritas submitted a merger agreement and the $2.5 million escrow payment in accordance with these conditions. Milton

---

**4.** For the sake of simplicity, we follow the parties' convention and refer collectively to defendants Knightsbridge Capital Corporation, Royalty Acquisition Corp., and Royalty Corporation as "Knightsbridge."

**5.** Shortly before the board approved the merger on June 13, 1997, two directors, Sylvan Lefcor and Morton Fields, resigned from the board. The remaining five directors approved the merger agreement unanimously.

**6.** In the event that the Frederick's board terminated the merger agreement in order to accept a superior proposal by a third party bidder, the agreement entitled Knightsbridge to liquidated damages of $1.8 million.

**7.** As noted earlier, the Trusts held about 40% of the Class A shares and 50% of the Class B

shares. Knightsbridge also extended its $6.90 offer price to all outstanding Frederick's shares.

**8.** On August 28, 1997, shortly after signing the stock purchase agreement, Knightsbridge sent a letter to the Frederick's board to inform it that Knightsbridge had "acquired" the Trusts' shares and that it would "not vote in favor of" any competing third party bids. That letter did not mention the Trusts' right to terminate the agreement in favor of a higher offer. Knightsbridge also sent a letter to the Frederick's board on September 1, 1997 restating its intention to consummate the merger on September 3, 1997 under the terms of the original merger agreement.

did not.[9]

On September 3, 1997, the Frederick's board met with representatives of Veritas to discuss the terms of the Veritas offer. According to the plaintiffs, the board asserts that, at this meeting, it orally informed Veritas that it was required to produce its "final, best offer" by September 4, 1997. The plaintiffs further allege that that board did not, in fact, inform Veritas of this requirement.

The same day that the board met with Veritas, Knightsbridge and the Trusts amended their stock purchase agreement to eliminate the Trusts' termination rights and other conditions on the sale of the Trusts' shares. On September 4, 1997, Knightsbridge exercised its rights under the agreement and purchased the Trusts' shares. Knightsbridge immediately informed the board of its acquisition of the Trusts' shares and repeated its intention to vote the shares against any competing third party bids.

One day after Knightsbridge acquired the Trusts' shares, the Frederick's board participated in a conference call with Veritas to discuss further the terms of the proposed merger. During this conference call, Veritas representatives suggested that, if the board elected to accept the Veritas offer, the board could issue an option to Veritas to purchase authorized but unissued Frederick's shares as a means to circumvent the 41% block of voting shares that Knightsbridge had acquired from the Trusts. Frederick's rep-

resentatives also expressed some concern that Knightsbridge would sue the board if it decided to terminate the June 15, 1997 merger agreement. In response, Veritas agreed to indemnify the directors in the event of such litigation.

On September 6, 1997, Knightsbridge increased its bid to match the $7.75 Veritas offer, but on the condition that the board accept a variety of terms designed to restrict its ability to pursue superior offers.[10] On the same day, the Frederick's board approved this agreement and effectively ended the bidding process. Two days later, Knightsbridge purchased additional Frederick's Class A shares on the open market, at an average price of $8.21 per share, thereby acquiring a majority of both classes of Frederick's shares.

On September 11, 1997, Veritas increased its cash offer to $9.00 per share. Relying on (1) the "no-talk" provision in the merger agreement, (2) Knightsbridge's stated intention to vote its shares against third party bids, and (3) Veritas' request for an option to dilute Knightsbridge's interest, the board rejected the revised Veritas bid. On September 18, 1997, the board amended its earlier Consent Solicitation Statement to include the events that had transpired since July 1997. The deadline for responses to the consent solicitation was September 29, 1997, the scheduled closing date for the merger.

Before the merger closed, the plaintiffs filed in the Court of Chancery the purported class action complaint that is the prede-

---

9. Milton apparently discontinued its efforts to acquire Frederick's after Veritas submitted its higher bid.

10. The terms included: a provision prohibiting any Frederick's representative from speaking to third party bidders concerning the acquisition of the company (the "no-talk" provision); a termination fee of $4.5 million (about 7% of the value of the transaction); the

appointment of a non-voting Knightsbridge observer at Frederick's board meetings; and an obligation to grant Knightsbridge any stock option that Frederick's granted to a competing bidder. The revised merger agreement did not expressly permit the Frederick's board to pursue negotiations with third parties where its fiduciary duties required it to do so.

cessor of the amended complaint before us. The plaintiffs also moved for a temporary restraining order enjoining the merger. The Court of Chancery denied the requested injunctive relief.[11]

The plaintiffs then amended their complaint to include a class action claim for damages caused by the termination of the auction in favor of Knightsbridge and the rejection of the higher Veritas offer. The amended complaint alleged that the Frederick's board had breached its fiduciary duties in connection with the sale of the company and had misstated and omitted material information in the Consent Solicitation Statement. The plaintiffs also sued Knightsbridge, alleging that it aided and abetted the board's breach of fiduciary duties and it tortiously interfered with the stockholders' prospective business relations (that is, the $9.00 Veritas bid).

The Court of Chancery granted the directors' motion to dismiss the amended complaint under Chancery Rule 12(b)(6), concluding that: (1) the complaint did not support a claim of breach of the board's duty of loyalty, (2) the exculpatory provision in the Frederick's charter precluded money damages against the directors for

any breach of the board's duty of care, and (3) any misstatements or omissions in the Consent Solicitation Statement were immaterial as a matter of law.[12] The court also dismissed the claims against Knightsbridge, holding that the allegations in the amended complaint do not suggest complicity between Knightsbridge and the board and do not support the plaintiffs' argument that the $9.00 Veritas bid was a "valid business expectancy." [13]

### Standard of Review

 We review *de novo* the dismissal by the Court of Chancery of a complaint under Rule 12(b)(6).[14] The complaint ordinarily defines the universe of facts from which the trial court may draw in ruling on a motion to dismiss.[15] Because a motion to dismiss under Chancery Rule 12(b)(6) must be decided without the benefit of a factual record, the Court of Chancery may not resolve material factual disputes; instead, the court is required to assume as true the well-pleaded allegations in the complaint.[16] The trial court may dismiss a complaint under Rule 12(b)(6) only where the court determines with "reasonable certainty" that the plaintiff could prevail on

**11.** See In re *Frederick's of Hollywood, Inc. Shareholders Litigation*, Del. Ch., C.A. No. 15944 (Sept. 29, 1997) (ORDER).

**12.** See In re *Frederick's of Hollywood, Inc. Shareholders Litigation*, Del. Ch., C.A. No. 15944 (July 9, 1998) (July 1998 Mem. Op.).

**13.** See In re *Frederick's of Hollywood, Inc. Shareholders Litigation*, Del. Ch., C.A. No. 15944 (Jan. 31, 2000) (January 2000 Mem. Op.).

**14.** *McMullin v. Beran*, Del.Supr., 765 A.2d 910, 916 (2000).

**15.** See In re *Santa Fe Pacific Corp. Shareholder Litigation*, Del.Supr., 669 A.2d 59, 68 (1995) ("Generally, matters outside the pleadings should not be considered in ruling on a motion to dismiss"); *see also Goldman v. Bel-*

den, 2nd Cir., 754 F.2d 1059, 1065 (1985) ("[A] Rule 12(b)(6) motion is addressed to the face of the pleading.").

**16.** See *Solomon v. Pathe Communications Corp.*, 672 A.2d 35, 38 (1996); *cf. Vanderbilt Income and Growth Associates, L.L.C. v. Arvida/JMB Managers, Inc.*, Del.Supr., 691 A.2d 609, 613 (1996) ("On a motion to dismiss for failure to state a claim, a trial court cannot choose between two differing reasonable interpretations of ambiguous documents."). In this context, "well-pleaded allegations" include specific allegations of fact and conclusions supported by specific allegations of fact. See *Solomon*, 672 A.2d at 38 (quoting In re *Tri-Star Pictures, Inc., Litig.*, Del.Supr., 634 A.2d 319, 326 (1993)).

no set of facts that may be inferred from the well-pleaded allegations in the complaint.[17] This standard is based on the "notice pleading" requirement established in Ct. Ch. R. 8(e) and is "less stringent than the standard applied when evaluating whether a pre-suit demand has been excused in a stockholder derivative suit filed pursuant to Chancery Rule 23.1." [18]

■ Of course, the trial court is not required to accept every strained interpretation of the allegations proposed by the plaintiff, but the plaintiff is entitled to all reasonable inferences that logically flow from the face of the complaint. Moreover, a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law.[19]

## The Duty of Loyalty Claim

■ The central claim in the amended complaint is that the sale of Frederick's to Knightsbridge "constituted a breach of [the Frederick's board's] fiduciary obligation to maximize shareholder value" because the board did not "conduct an auction with a 'level playing field' " as required by *Revlon, Inc. v. MacAndrews & Forbes Holdings*.[20] The plaintiffs contend that this sort of allegation cannot be neatly divided into duty of care claims and duty of loyalty claims.

In our view, *Revlon* neither creates a new type of fiduciary duty in the sale-of-control context nor alters the nature of the fiduciary duties that generally apply. Rather, *Revlon* emphasizes that the board must perform its fiduciary duties in the service of a specific objective: maximizing the sale price of the enterprise.[21] Al-

---

17. *See Solomon*, 672 A.2d at 38 ("[A] motion to dismiss ... requires the court to determine with 'reasonable certainty' that a plaintiff could prevail on no set of facts that can be inferred from the pleadings.") (citing *Grobow v. Perot*, Del.Supr., 539 A.2d 180, 187 n. 6 (1988); *Rabkin v. Philip A. Hunt Chemical Corp.*, Del.Supr., 498 A.2d 1099, 1104 (1985)); *see also Vanderbilt*, 691 A.2d at 612 ("This Court, like the trial court, must determine whether it appears with reasonable certainty that, under any set of facts which could be proven to support the claim, the plaintiffs would not be entitled to relief.").

18. *Solomon*, 672 A.2d at 38; *see also Brehm v. Eisner*, Del.Supr., 746 A.2d 244, 253–54 (2000).

19. *See, e.g., R.J.R. Services, Inc. v. Aetna Cas. and Sur. Co.*, 7th Cir., 895 F.2d 279, 281 (1989) ("However, we are not obliged to ignore any facts set forth in the complaint that undermine the plaintiff's claim ....") (citation omitted); *Slaney v. Int'l Amateur Athletic Fed'n*, 7th Cir., 244 F.3d 580, 597 (2001) (same); *Associated Builders, Inc. v. Alabama Power Co.*, 5th Cir., 505 F.2d 97, 100 (1974) ("If the appended document, to be treated as part of the complaint for all purposes under Rule 10(c), Fed.R.Civ.P., reveals facts which

foreclose recovery as a matter of law, dismissal is appropriate."); *Gant v. Wallingford Bd. of Educ.*, 2nd Cir., 69 F.3d 669, 674 (1995) (same); *cf. Quiller v. Barclays American/Credit, Inc.*, 11th Cir., 727 F.2d 1067, 1069 (1984) ("Nevertheless, a complaint may be dismissed under Rule 12(b)(6) when its own allegations indicate the existence of an affirmative defense, so long as the defense clearly appears on the face of the complaint."); *Jablon v. Dean Witter & Co.*, 9th Cir., 614 F.2d 677, 682 (1980) ("If the running of the statute [of limitations] is apparent on the face of the complaint, the defense may be raised by a motion to dismiss.").

20. Del.Supr., 506 A.2d 173, 182–83 (1986).

21. *See Revlon*, 506 A.2d at 182–83; *Paramount Communications Inc. v. QVC Network, Inc.*, 637 A.2d 34, 43 (1994) ("The directors' fiduciary duties in a sale of control context are those which generally attach. In short, 'the directors must act in accordance with their fundamental duties of care and loyalty.' ") (citation omitted); *id.* at 44 ("In the sale of control context, the directors must focus on one primary objective—to secure the transaction offering the best value reasonably available for the stockholders—and they must exercise their fiduciary duties to further that

though the *Revlon* doctrine imposes enhanced judicial scrutiny of certain transactions involving a sale of control, it does not eliminate the requirement that plaintiffs plead sufficient facts to support the underlying claims for a breach of fiduciary duties in conducting the sale.[22] Accordingly, we proceed to analyze the amended complaint to determine whether it alleges sufficient facts to support a claim that the board breached any of its fiduciary duties.[23]

The Court of Chancery concluded, and the plaintiffs do not appear to contest on appeal, that the amended complaint adequately alleges a conflict of interest with respect to only one of the directors who approved the Knightsbridge merger.[24] The amended complaint does not allege that the lone conflicted director dominated the three other directors who approved the merger on September 6, 1997.[25] The Court of Chancery therefore correctly held that the Knightsbridge merger was ap-

---

end."); *Barkan v. Amsted Indus. Inc.*, Del. Supr., 567 A.2d 1279, 1286 (1989) ("[T]he basic teaching of [*Revlon* and *Unocal*] is simply that directors must act in accordance with their fundamental duties of care and loyalty."); (citing *Uncoal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985); *Mills Acquisition Co. v. Macmillan. Inc.*, Del.Supr., 559 A.2d 1261, 1288 (1989) ("Beyond [getting the highest value reasonably attainable for the shareholders], there are no special and distinct 'Revlon duties.' "); *see also In re Lukens Inc. Shareholders Litigation*, Del. Ch., 757 A.2d 720, 730–31 (1999) (" 'Revlon' duties' refer only to a director's performance of his or her duties of care, good faith and loyalty in the unique factual circumstance of a sale of control over the corporate enterprise.").

**22.** The plaintiffs cite our decision in *Levy v. Stern*, Del.Supr., No. 211, 1996, 1996 WL 742818, Walsh, J. (Dec. 20, 1996) (ORDER), for the proposition that plaintiffs alleging a breach of the board's duties under *Revlon* are entitled to develop a factual record to determine the reasons for the board's action. The plaintiffs contend that, without a factual record on the rationale for board decisions, they have insufficient information to determine whether the board breached its duty of loyalty or its duty of care. As the plaintiffs concede, however, *Levy* merely holds that, before the trial court may rule a motion for summary judgment on the substantive merits of the plaintiffs' claims, plaintiffs must have a meaningful opportunity to conduct discovery on the information held by the defendants. *See Levy*, Order at ¶¶ 11–14. *Levy* does not entitle plaintiffs to discovery where they fail to identify and plead specific violations of the board's duties of care, good faith and loyalty.

**23.** *See McMullin*, 765 A.2d at 917 (citing *Cinerama, Inc. v. Technicolor, Inc.*, Del.Supr., 663 A.2d 1156, 1162 (1995)).

**24.** *See* January 2000 Mem. Op. at 17–18. In particular, the complaint alleges that the Knightsbridge merger agreement provided for several cash payments to George Townson, who was the CEO, President, and Chairman of Frederick's during the relevant period. The personal benefits allegedly received by Townson as a result of the Knightsbridge merger included: (1) a payment of $.05 for each "under water" option held by Townson with an exercise price below the merger price, (2) a severance payment of $750,000 upon consummation of the merger, and (3) a payment of $250,000 on the date of the merger and sixteen quarterly payments of $100,000 under a non-compete and consulting agreement. The complaint also alleges that William Barrett, who was a Frederick's director and a vice president of JMS, the firm's financial advisor, had an interest in the merger transaction. Specifically, the complaint alleges that Barrett's firm received a $2 million fee upon consummation of the Knightsbridge merger. But because Barrett's firm was entitled to receive a fee upon the consummation of *any* merger and because the fee was proportional to the sale price, the Court of Chancery correctly concluded that the complaint was insufficient to establish a disabling conflict with respect to Barrett. *See* January 2000 Mem. Op. at 17–18.

**25.** *See id.* at 17. Although five directors approved the original merger agreement on June 15, 1997, one of those directors, Hugh Hunter, retired before the board approved the final merger agreement in September 1997.

proved by a majority of disinterested directors.

The plaintiffs nevertheless argue that the amended complaint supports a claim that the directors breached their duty of loyalty by approving the Knightsbridge merger.[26] The complaint alleges that "Frederick's representatives expressed concern that if Frederick's approved the [June 15, 1997] Merger Agreement in favor of a transaction with Veritas, Knightsbridge would sue Frederick's and its directors." The plaintiffs argue that this allegation supports a reasonable inference that the directors' individual interests in avoiding personal liability to Knightsbridge influenced their decision to approve the Knightsbridge merger.

■ Except in egregious cases, the threat of personal liability for approving a merger transaction does not in itself provide a sufficient basis to question the disinterestedness of directors because the risk of litigation is present whenever a board decides to sell the company.[27] Moreover, even assuming *arguendo* that the threat of personal liability did raise some concerns about the disinterestedness of the directors, the amended complaint goes on to allege that Veritas agreed to indemnify the directors in the event that Knightsbridge sued them. This allegation undermines the plaintiffs' inference that the directors rejected the Veritas offer "to avoid becoming embroiled in litigation with Knightsbridge."[28] We therefore conclude that the facts alleged in the complaint do not state a cognizable claim that the directors acted in their own personal interests rather than in the best interests of the stockholders when they approved the Knightsbridge merger.[29]

### The Disclosure Claims

■ The plaintiffs next argue that September 18, 1997 Consent Solicitation Statement for the Knightsbridge merger contained material omissions and misrepresentations. In particular, the amended complaint alleges that the board (1) falsely

26. Although the plaintiffs raised this argument in their briefs before the Court of Chancery, the court did not dispose of this argument in its January 2000 opinion.

27. *See Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 815 (1984) ("[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists."). *But see Revlon*, 506 A.2d at 185 ("[W]hen a board ends an intense bidding contest on an insubstantial basis, and where a significant by-product of that action is to protect the directors against a perceived threat of personal liability for consequences stemming from the adoption of previous defensive measures, the action cannot withstand the enhanced scrutiny which *Unocal* requires of director conduct.").

28. The plaintiffs argue that this conclusion requires an impermissible weighing of facts on a motion to dismiss. But, assuming the truth of the allegations in the complaint, Veritas' alleged agreement to indemnify the directors in the event that Knightsbridge sued them essentially eliminates any concerns that the directors' decision to approve the Knightsbridge merger was motivated by a fear of personal liability. *Cf.* cases cited *supra* note 19.

29. In their supplemental brief, the plaintiffs also suggest that the board may have rejected the Veritas offer based on: (1) the interested director's desire to consummate the Knightsbridge deal, (2) a desire to benefit the Trusts with a quick deal, (3) "dislike" of Veritas, or (4) a personal desire to complete the sale process. These inferences, however, find no support in the allegations in the complaint. As a consequence, they are not a proper basis on which to conclude that the board breached its duty of loyalty and good faith.

asserted that it orally informed Veritas of a September 4, 1997 deadline for its final offer, (2) failed to disclose the reason for the resignation of two directors just before the board approved the initial Knightsbridge offer in June 1997, and (3) failed to disclose that the board did not negotiate with Veritas concerning terms of the proposed dilutive option. The Court of Chancery concluded that the alleged misstatements and omissions were immaterial as a matter of law.[30]

▮▮▮▮ We begin by observing that the board's fiduciary duty of disclosure, like the board's duties under *Revlon* and its progeny, is not an independent duties but the application in a specific context of the board's fiduciary duties of care, good faith, and loyalty.[31] Where the board issues a

Consent Solicitation Statement in contemplation of stockholder action, the board is obligated "to disclose fully and fairly all material information within the board's control."[32] In *Arnold v. Society for Savings Bancorp, Inc.*, this Court adopted the following definition of materiality: "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[33]

▮▮▮▮ Although materiality determinations under this standard are necessarily fact-intensive and do not generally lend themselves to dismissal on the pleadings,[34] some statements or omissions may be immaterial as a matter of law.[35] To survive a

---

**30.** *See* January 2000 Mem. Op. at 19–21.

**31.** *See Cinerama, Inc. v. Technicolor, Inc.*, Del.Supr., 663 A.2d 1156, 1163 (1995) ("A combination of the fiduciary duties of care and loyalty gives rise to the requirement that 'a director disclose to shareholders all material facts bearing upon a merger vote....' ") (footnote and citation omitted); *see also Stroud v. Grace*, Del.Supr., 606 A.2d 75, 84–88 (1992) (observing that the duty of candor "represents nothing more than the well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action"); *cf. Arnold v. Society for Sav. Bancorp. Inc.*, Del.Supr., 650 A.2d 1270, 1287 (1994) ("[C]laims alleging disclosure violations that do not otherwise fall within any exception are protected by Section 102(b)(7) and any certificate of incorporation provision ... adopted pursuant thereto.").

**32.** *Stroud*, 606 A.2d at 84–85; *see also Arnold*, 650 A.2d at 1277 (discussing the disclosure rule in *Stroud* ). We have further held "that directors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty, and may be held accountable in a manner appropriate to the circumstances." *Malone v. Brincat*, Del.Supr., 722 A.2d 5, 9 (1998).

**33.** 650 A.2d at 1277 (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)); *see also Zirn v. VLI Corp.*, Del. Supr., 621 A.2d 773, 778 (1993) (" 'While it need not be shown that an omission or distortion would have made an investor change his overall view of a proposed transaction, it must be shown that the fact in question would have been relevant to him.' ") (quoting *Barkan*, 567 A.2d at 1289).

**34.** *See Branson v. Exide Electronics Corp.*, Del.Supr., No. 457, 1992, , 1994 WL 164084, Holland, J. (April 25, 1994) (ORDER), Order at ¶ 10 ("Whether or not a statement or omission in an offering prospectus was material is a question of fact that generally cannot be resolved on a motion to dismiss, but rather it must be determined after the development of an evidentiary record.").

**35.** *See, e.g., Sanders v. Devine*, Del. Ch., C.A. No. 14679, , 1997 WL 599539, Lamb, V.C. (Sept. 24, 1997) (Mem.Op.) ("When viewed in light of the clear and repeated disclosure about the possibility of a cash-out merger, the alleged omissions ... are immaterial as a matter of law."): *Herd v. Major Realty Corp.*, Del. Ch., C.A. No. 10707, 1990 WL 212307, Chandler, V.C. (Dec. 21, 1990) ("[I]n light of the fact that Major's real estate assets have a total appraisal value of close to $190 million,

motion to dismiss, the plaintiffs "must provide some basis for a court to infer that the alleged violations were material. For example, a pleader must allege that facts are missing from the statement, identify those facts, state why they meet the materiality standard and how the omission caused injury." [36]

In the present case, the amended complaint alleges that the board falsely asserted in the Consent Solicitation Statement that Veritas had been orally informed of the September 4, 1997 deadline for its "best, final offer." The amended complaint also alleges that Veritas' failure to comply with this requirement was among the reasons presented in the Consent Solicitation Statement for the board's decision to reject the Veritas offer. The plaintiffs maintain that this alleged misrepresentation is material because a stockholder's decision to ratify or reject a board decision is based, at least in part, on the board's stated rationale for its recommendation. The plaintiffs thus argue that a Frederick's stockholder would be more likely to ratify the board's decision to re-ject the Veritas bid if the board's decision was based on a good reason—that is, because the bid came too late.[37]

The Court of Chancery found that this alleged misstatement was immaterial as a matter of law because the Consent Solicitation disclosed Veritas' later $9.00 offer.[38] Since the stockholders were aware of the higher bid, the Court of Chancery concluded that the timeliness of the offer was irrelevant.

We agree with the Court of Chancery that the board's disclosure of the $9.00 bid renders immaterial as a matter of law any misstatement about the rationale of the Frederick's board for rejecting the bid. The importance that a stockholder ascribes to the availability of a higher bid in deciding whether to vote for or against a proposed merger is independent of the timeliness of the higher bid. Whether the bid was submitted on time or late would not "significantly alter" the stockholder's assessment of the attractiveness of the offer.[39] Accordingly, we conclude that the

the inclusion or exclusion of 1.07 acres is immaterial as a matter of law."); *In re Wheelabrator Technologies Inc. Shareholders Litigation*, Del. Ch., C.A. No. 11495, Jacobs, V.C. (Sept. 1, 1992) (finding various disclosure claims immaterial as a matter of law).

**36.** *Loudon v. Archer–Daniels–Midland Co.*, Del.Supr., 700 A.2d 135, 142 (1997).

**37.** The plaintiffs also suggest that the misstatement is material because a more accurate statement of the events surrounding the board's rejection of Veritas' bid would have indicated that the auction "process is flawed." We do not find this argument persuasive. Although, as a general matter, "directors who disclose such a recommendation [must] also disclose such information about the background of the transaction, the process followed by them to maximize value in the sale, and their reason for approving the transaction," *see Matador Capital Management Corp. v. BRC Holdings, Inc.*, Del. Ch., 729 A.2d 280, 295 (1998), some details of the

auction process may be immaterial as a matter of law under the circumstances. We also note that the alleged misstatement here is far less serious than those in *McMullin*, such as the failure to disclose other potential bidders' interest in purchasing the firm and failure to disclose the actions of the majority stockholder to prevent sale the sale of the company to another bidder. *See McMullin*, 765 A.2d at 926.

**38.** *See* January 2000 Mem. Op. at 19–20.

**39.** In deciding to ignore the $9.00 Veritas bid, the board also relied on several other circumstances, including the fact that Knightsbridge vowed to vote its 41% interest against any other bids and the fact that a dilutive option could be required to secure ratification of a merger with a third party. These additional rationales for the board's decision make it even less likely that the perceived timeliness of the bid "significantly altered the 'total mix' of information made available."

board's misstatement could not have been material to the reasonable stockholder.

■■ The amended complaint also alleges that the Consent Solicitation Statement failed to disclose the reasons for the resignation of two directors in June 1997, although that pleading does acknowledge that the fact of these resignations was disclosed. The allegation that two directors resigned from the board immediately before the board approved the Knightsbridge merger tends to support, for notice pleading purposes, a reasonable inference that the directors resigned as a result of a disagreement over corporate policy. Moreover, the resignation of board members and other key advisors based on a disagreement about corporate policy may, in some circumstances, be material information that must be disclosed to stockholders.[40]

But the amended complaint does not allege—or present facts supporting an inference—that the board was aware of the reasons for the directors' resignations.[41] Absent some indication that the directors informed the board of their reasons for leaving, the board did not have a duty to disclose its assumptions about why the directors resigned. We also note that the two directors resigned before the board approved the June 15, 1997 merger agreement with Knightsbridge—well before the

Frederick's stockholders were asked to approve the September 1997 merger agreement. It thus requires a significant logical leap to suppose that reasonable stockholders would consider this information significant in the total mix of information available to them in September 1997.

■■ Finally, the amended complaint alleges that the Consent Solicitation Statement did not disclose the fact that Veritas was prepared to negotiate the terms of the dilutive option that it had requested to circumvent Knightsbridge's voting power. Since the Consent Solicitation Statement indicated that the board relied on Veritas' request for a dilutive option in rejecting the bid, the plaintiffs argue, the board was obligated to disclose that the terms of the option were negotiable.

This argument is based on a misreading of the Consent Solicitation Statement. The Statement indicates that the board declined to pursue the $9.00 bid in part because of "the Board's continuing concern regarding the legality and practicality of issuing a dilutive option to [Veritas]." Thus, the board rejected the Veritas offer because the board was concerned about the legal validity of a dilutive option—regardless of the option's terms—and not because the terms of the option were nonnegotiable.[42] We therefore agree with

---

**40.** For example, SEC regulations require the disclosure of an auditor's resignation within five days because an auditor's resignation is important "in bringing to light disagreements or difficulties concerning management policies or practices that may be material to an investment decision with regard to the registrant's securities." Fed. Securities L. Rptr. (CCH) ¶ 72,434 (1989).

**41.** The plaintiffs argue that "the only reasonable inference from the Complaint is that after years of board service together with the individual defendants, [the two directors who resigned] would have conveyed to at least some of the individual defendants some rea-

son for their resignations." We do not find this argument convincing. The complaint alleges that the directors who resigned served on the board for a total of forty years, but their mere presence on the board—even for an extended period—is an insufficient factual basis from which to infer that the two directors actually explained their resignation to the other members of the board.

**42.** *See* January 2000 Mem. Op. at 20–21. On a motion to dismiss, we, like the Court of Chancery, may consider the language of the Consent Solicitation referenced in the complaint because the "the operative facts relating to such a claim perforce depend upon the

conclusion of the Court of Chancery that the negotiability of the option terms was not relevant to the board's asserted concerns with the Veritas bid and would not be material to assessing the board's rationale for rejecting the bid.

### The Due Care Claim

Having concluded that the complaint was properly dismissed under Chancery Rule 12(b)(6) for failure to state a claim on which relief may be granted on other fiduciary duty claims, we now turn to the due care claim. The primary due care issue is whether the board was grossly negligent, and therefore breached its duty of due care, in failing to implement a routine defensive strategy that could enable the board to negotiate for a higher bid or otherwise create a tactical advantage to enhance stockholder value.

In this case, that routine strategy would have been for the directors to use a poison pill to ward off Knightsbridge's advances and thus to prevent Knightsbridge from stopping the auction process. Had they done so, plaintiffs seem to allege that the directors could have preserved the appropriate options for an auction process designed to achieve the best value for the stockholders.

Construing the amended complaint most favorably to the plaintiffs, it can be read to allege that the board was grossly negligent in immediately accepting the Knightsbridge offer and agreeing to various restrictions on further negotiations without first determining whether Veritas would issue a counteroffer. Although the board had conducted a search for a buyer over one year, plaintiffs seem to contend that the board was imprudently hasty in agreeing to a restrictive merger agreement on the day it was proposed—particularly where other bidders had recently expressed interest.[43] Although the board's haste, in itself, might not constitute a breach of the board's duty of care because the board had already conducted a lengthy sale process, the plaintiffs argue that the board's decision to accept allegedly extreme contractual restrictions impacted its ability to obtain a higher sale price. Recognizing that, at the end of the day, plaintiffs would have an uphill battle in overcoming the presumption of the business judgment rule,[44] we must give plaintiffs the benefit of the doubt at this pleading stage to determine if they have stated a due care claim. Because of our ultimate decision, however, we need not finally decide this question in this case.

We assume, therefore, without deciding, that a claim for relief based on gross negligence during the board's auction process is stated by the inferences most favorable to plaintiffs that flow from these allegations. The issue then becomes whether the amended complaint may be dismissed upon a Rule 12(b)(6) motion by reason of the existence and the legal effect of the exculpatory provision of Article TWELFTH of Frederick's certificate of incorporation, adopted pursuant to 8 *Del. C.* § 102(b)(7). That provision would exempt directors from personal liability in damages with

---

language of the [document]." *In re Santa Fe Pacific Corp. Shareholder Litigation*, Del. Supr., 669 A.2d 59, 69–70 (1995).

**43.** Relatedly, the plaintiffs also argue that the board breached its fiduciary duties by favoring Knightsbridge over Veritas in the bidding process.

**44.** *See Pogostin v. Rice*, Del.Supr., 480 A.2d 619, 627 (1984) (discussing the "function and operation of the business judgment rule, including the standards by which director conduct is judged"), *overruled on other grounds by Brehm v. Eisner*, Del.Supr., 746 A.2d 244, 253–54 (2000).

certain exceptions (*e.g.*, breach of the duty of loyalty) that are not applicable here.[45]

### A. The Exculpatory Charter Provision Was Properly Before the Court of Chancery

The threshold inquiry is whether Article TWELFTH of the Frederick's certificate of incorporation was properly before the Court of Chancery. In their brief in support of their motion to dismiss in the Court of Chancery, the director defendants interposed the Section 102(b)(7) charter provision as a bar to plaintiffs' claims based on an alleged breach of the duty of care.[46]

This provision, which appeared for the first time in the director defendants' brief in the Court of Chancery, was placed before the court without any authentication or supporting affidavit. The existence and authenticity of this provision was never questioned by plaintiffs, however. The trial court therefore tacitly accepted it as authentic without defendants formally ask-

ing the court to take judicial notice of its existence, which could easily be found in the public files in the Secretary of State's office and could properly be noticed judicially by the court.[47]

Because the charter provision is not found within the four corners of the complaint, it is a "matter outside the pleading." Accordingly, on a Rule 12(b)(6) motion to dismiss, if

> matters outside the pleading are presented to and not excluded by the Court the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given a reasonable opportunity to present all material made pertinent to such a motion by Rule 56.[48]

Under Rule 56 in this context, there *may* be an opportunity for either side to submit affidavits or engage in discovery[49] to explore the "matter outside the pleadings [that had been] . . . presented to and not excluded by the Court."[50]

---

**45.** Article TWELFTH provides:

TWELFTH. A director of this Corporation shall not be personally liable to the Corporation or its shareholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its shareholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction for which the director derived an improper personal benefit.

**46.** The motion of defendant directors under Rule 12(b)(6) did not mention the Frederick's charter and simply stated:

Defendants George W. Townson, Richard O. Starbird, William J. Barrett and Merle A. Johnston, . . . pursuant to Court of Chancery Rule 12(b)(6), hereby move to dismiss the Consolidated Amended Class Action Complaint. The grounds for this motion will be set forth in the briefs to be filed in

support of the motion in accordance with a briefing schedule to be agreed upon by the parties.

**47.** *See* Delaware Rules of Evidence (D.R.E.) Rule 201, which provides:

Rule 201. Judicial notice of adjudicative facts.

\* \* \*

A judicially noticed fact must be one not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

\* \* \*

A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken.

**48.** Chancery Rule 12(b).

**49.** *See* Chancery Rule 56(c).

■ Simply because a matter outside the pleading has been presented under Rule 12(b)(6) and thereby must be "treated as one for summary judgment" with "all parties ... given a reasonable opportunity to present all material made pertinent to such a motion by Rule 56,"[51] it does not follow that the "floodgates of discovery" have to be opened. The Rule 56 opportunity to present affidavits or engage in discovery is not absolute. It is necessarily circumscribed by the discretion of the trial court in determining the scope of the "matters outside the pleading" that had been presented in connection with the Rule 12(b)(6) motion. Indeed, plaintiffs here do not contend that simply because defendants invoked the Section 102(b)(7)

charter provision they are thereby invited to go on a fishing expedition. Accordingly, when matters outside the pleading—such as a Section 102(b)(7) charter provision—are presented, the trial court should carefully limit the discovery sought to a scope that is coextensive with the issue necessary to resolve the motion.[52] Here, there was apparently no discovery issue.[53]

When the issue is confined to the legal effect of a Section 102(b)(7) charter provision, it is difficult to envision what discovery would be implicated. To be sure, in a due care case where a Section 102(b)(7) charter provision is invoked, a plaintiff could theoretically contest the validity of the charter provision. In such a case, the plaintiff must have a proper basis[54] to claim that the Section 102(b)(7) charter

**50.** Chancery Rule 12(b).

**51.** Chancery Rule 12(b).

**52.** *See* Chancery Rule 26(c); *cf. Vanderbilt Income and Growth Associates,* Del.Supr., 691 A.2d 609, 610 (1996) (even if the truth of documents outside the pleadings are relied on to support a Rule 12(b)(6) motion, thereby converting the motion to one for summary judgment under Rule 56, discovery if necessary may be limited.); *Zapata Corp. v. Maldonado,* Del.Supr., 430 A.2d 779, 787–88 (1981) (characterizing a motion to terminate a derivative action in a demand excused case as a "hybrid summary judgment motion for dismissal" and finding that "[l]imited discovery may be ordered to facilitate" inquiries into the independence and good faith of the special committee that seeks dismissal of the derivative action); *Kaplan v. Wyatt,* Del. Ch., 484 A.2d 501, 507 (1984) ("[T]he type and extent of any discovery [authorized by *Zapata*] in a particular case [into the good faith and independence of the litigation committee] is a matter left to the discretion of the Court and may be undertaken only if first authorized by the Court."), *aff'd,* Del.Supr., 499 A.2d 1184 (1985); *Wood v. Best,* Del. Ch., C.A. No. 16281, 1999 WL 743482, Chandler, C. (Sept. 7, 1999) ("I advised counsel that I would treat defendants' motion to dismiss as a motion for summary judgment. And be-

cause of the possible factual dispute over whether some (or all) of the plaintiffs 'voluntarily' accepted the merger consideration, I granted plaintiffs leave to take or provide limited discovery on that discrete factual issue."); *Avacus Partners, L.P. v. Brian,* Del. Ch., C.A. No. 11001, 1989 WL 120392, Allen, C. (Oct. 5, 1989) (Mem.Op.), Mem. Op. at 2 ("[W]hen courts grant discovery under Rule 56(f), such discovery is normally limited in scope.") (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 298, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

**53.** *Cf. Midland Food Services, LLC v. Castle Hill Holdings V, LLC,* Del.Supr., No. 509, 1999, 2001 WL 760862, Veasey, C.J. (June 15, 2001) (ORDER) ("To the extent that appellants had claimed on appeal that the Vice Chancellor improperly considered matters outside the pleadings on a motion to dismiss under Chancery Rule 12(b)(6), we find that appellants expressly acquiesced in the consideration of the questioned matters and abandoned their initial contention that these matters could not be considered on a motion to dismiss.").

**54.** *See* Chancery Rule 11(c) (attorney signing a pleading or other paper represents to the Court, *inter alia,* that the legal claims are not frivolous and the factual claims are believed in good faith to have evidentiary support).

provision presented by the defendants on the Rule 12(b)(6) motion is not authentic, was improperly adopted by the stockholders, or the like.

Plaintiffs make no such claim here. Although plaintiffs contend that under *Emerald Partners*[55] the burden is on the defendants to produce evidence to support a Section 102(b)(7) defense, they do not contest the existence or authenticity of Frederick's 102(b)(7) charter provision. There being no Rule 56 avenue of discovery or affidavits that would be relevant to the narrow issue before the trial court in this case, we conclude that the plaintiffs were not deprived of any important procedural right arising from the fact that the trial court considered Frederick's 102(b)(7) charter exculpation provision in connection with the Rule 12(b)(6) motion to dismiss. Although it would have been preferable for the trial court to have observed the precise provisions of the rules and to have expressly treated the motion as one for summary judgment once the Section 102(b)(7) charter provision was interposed by the director defendants, we find no reversible error in failing to do so. The provision was properly before the Court of Chancery in deciding on the director defendants' motion to dismiss.

As guidance for future cases, we observe that there are several methods available to the defense to raise and argue the applicability of the bar of a Section 102(b)(7) charter provision to a due care claim. The Section 102(b)(7) bar may be raised on a

Rule 12(b)(6) motion to dismiss (with or without the filing of an answer), a motion for judgment on the pleadings (after filing an answer),[56] or a motion for summary judgment (or partial summary judgment) under Rule 56 after an answer, with or without supporting affidavits.

In the case of a Rule 12(b)(6) motion, as here, if the Section 102(b)(7) charter provision is raised for the first time in the motion or brief in support of the motion, it is a matter outside the pleading. If not excluded by the court, the existence of such matter means that the motion will be converted, by clear force of the pleading rules, into a motion for summary judgment under Rule 56 and should be handled as we have noted above.

### B. *Application of* Emerald Partners

We now address plaintiffs' argument that the trial court committed error, based on certain language in *Emerald Partners*,[57] by barring their due care claims. Plaintiffs' arguments on this point are based on an erroneous premise, and our decision here is not inconsistent with *Emerald Partners*.

In *Emerald Partners*, we made two important points about the raising of Section 102(b)(7) charter provisions. First we said: "[T]he shield from liability provided by a certificate of incorporation provision adopted pursuant to 8 *Del. C.* § 102(b)(7) is in the nature of an affirmative defense."[58] Second, we said:

---

55. Del.Supr., 726 A.2d 1215 (1999).

56. Chancery Rule 12(c). Under this Rule, the charter provision could be asserted in and attached to the answer. The Court may or may not order a full or partial reply to the answer, which reply would optimally focus on the Section 102(b)(7) charter provision. *See* Chancery Rule 7(a). This would probably be the best practice to employ in these situations. But in some cases, filing an answer to a long

and prolix complaint might be onerous. *Cf. Brehm v. Eisner*, Del.Supr., 746 A.2d 244, 249 (2000) ("The Complaint, consisting of 88 pages and 285 paragraphs, is a pastiche of prolix invective ... [and] serve[s] no purpose other than to complicate the work of reviewing courts.").

57. 726 A.2d at 1223–24.

[W]here the factual basis for a claim *solely* implicates a violation of the duty of care, this court has indicated that the protections of such a charter provision may properly be invoked and applied. *Arnold v. Society for Savings Bancorp.*, Del.Supr., 650 A.2d 1270, 1288 (1994); *Zirn v. VLI Corp.*, Del.Supr., 681 A.2d 1050, 1061 (1996).[59]

Based on this language in *Emerald Partners*, plaintiffs make two arguments. First, they argue that the Court of Chancery in this case should not have dismissed their due care claims because these claims are intertwined with, and thus indistinguishable from, the duty of loyalty and bad faith claims.[60] Second, plaintiffs contend that the Court of Chancery incorrectly assigned to them the burden of going forward with proof.

### 1. The Court of Chancery Properly Dismissed Claims Based Solely on the Duty of Care

 Plaintiffs here, while not conceding that the Section 102(b)(7) charter provision may be considered on this Rule 12(b)(6) motion nevertheless, in effect, conceded in oral argument in the Court of Chancery and similarly in oral argument in this Court that if a complaint unambiguously and solely asserted only a due care claim, the complaint is dismissible once the corporation's Section 102(b)(7) provision is invoked.[61] This concession is in line with our holding in *Emerald Partners* quoted above.

Plaintiffs contended vigorously, however, that the Section 102(b)(7) charter provision does not apply to bar their claims in this case because the amended complaint alleges breaches of the duty of loyalty and other claims that are not barred by the charter provision. As a result, plaintiffs maintain, this case cannot be boiled down solely to a due care case. They argue, in effect, that their complaint is sufficiently well-pleaded that—*as a matter of law*—the due care claims are so inextricably intertwined with loyalty and bad faith claims that Section 102(b)(7) is not a bar to recovery of damages against the directors.[62]

---

**58.** *Id.* at 1223.

**59.** *Id.* at 1224.

**60.** *Cf. McMullin,* 765 A.2d at 922–26 (analyzing separately several related claims alleging breaches of the board's duty of care, duty of loyalty, and disclosure duties).

**61.** The exchange before this Court proceeded as follows:

Justice Walsh: [I]f it's clear from your complaint that you have pleaded only duty of care claims, then it seems to me that the court, appropriately under the motion to dismiss, would apply the charter provisions, assuming that the motion to dismiss was based on that.

Mr. Monhait: I agree with that, your Honor. I am not disputing that....

The Chief Justice: But the [Court of Chancery] says here at page 16 of its opinion that the plaintiffs misread *Emerald Partners.*

The Court has interpreted the language as not precluding a 12(b)(6) dismissal that the directors breached their fiduciary duty of care on the basis of an exculpatory provision so long as the dismissal on that ground does not prevent the plaintiff from well-pleaded allegations that they breached their duty of loyalty. And then the court said, under this reading of *Emerald Partners,* where a complaint alleges actionable disloyalty, the burden will shift to the defendants to show the immunizing effect of the charter. But where the complaint alleges only breaches of the duty of care then the claim may be dismissed at the pleading stage. You do not contest, you do not disagree with that statement in that paragraph....

Mr. Monhait: I do not Your Honor. I made a broader argument in the Court of Chancery, and Vice Chancellor Jacobs was responding to that. And I have narrowed that today.

We disagree. It is the plaintiffs who have a burden to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."[63] The plaintiffs are entitled to all reasonable inferences flowing from their pleadings, but if those inferences do not support a valid legal claim, the complaint should be dismissed without the need for the defendants to file an answer and without proceeding with discovery. Here we have assumed, without deciding, that the amended complaint on its face states a due care claim. Because we have determined that the complaint fails properly to invoke loyalty and bad faith claims, we are left with only a due care claim. Defendants had the obligation to raise the bar of Section 102(b)(7) as a defense, and they did. As plaintiffs conceded in oral argument before this Court, if there is only an unambiguous, residual due care claim and nothing else—*as a matter of law*—then Section 102(b)(7) would bar the claim. Accordingly, the Court of Chancery did not err in dismissing the plaintiffs due care claim in this case.

### 2. The Court of Chancery Correctly Applied the Parties' Respective Burdens of Proof

 Plaintiffs also assert that the trial court in the case before us incorrectly placed on plaintiffs a pleading burden to negate the elements of the 102(b)(7) charter provision. Plaintiffs argue that this ruling is inconsistent with the statement in *Emerald Partners* that "the shield from liability provided by a certificate of incorporation provision adopted pursuant to 8 *Del. C.* § 102(b)(7) is in the nature of an affirmative defense.... Defendants seeking exculpation under such a provision will normally bear the burden of establishing each of its elements."[64]

The procedural posture here is quite different from that in *Emerald Partners*. There the Court stated that it was incorrect for the trial court to grant summary judgment on the record in that case because the defendants had the burden *at trial* of demonstrating good faith if they were invoking the statutory exculpation provision. In this case, we focus not on trial burdens, but only on pleading issues. A plaintiff must allege well-pleaded facts stating a claim on which relief may be granted. Had plaintiff alleged such well-pleaded facts supporting a breach of loyalty or bad faith claim, the Section 102(b)(7) charter provision would have been unavailing as to such claims, and this case would have gone forward.[65]

But we have held that the amended complaint here does not allege a loyalty violation or other violation falling within the exceptions to the Section 102(b)(7) exculpation provision. Likewise, we have held that, even if the plaintiffs had stated a claim for gross negligence, such a well-pleaded claim is unavailing because defendants have brought forth the Section

---

62. *Cf. McMullin,* 765 A.2d at 922–926.

63. Chancery Rule 8(a).

64. *Emerald Partners,* 726 A.2d at 1223–24.

65. *See McMullin,* 765 A.2d at 926 ("We also note ... that such [exculpatory] provisions cannot provide protection for directors who breach their duty of loyalty."). Plaintiffs are therefore not required, as the plaintiffs suggest, "to plead facts negating the elements of a § 102(b)(7) defense." Rather, plaintiffs must plead facts supporting a claim that is not barred by the exculpatory charter provision—for example, a claim for a breach of the board's duty of good faith or loyalty. If the plaintiff were to establish by proof at trial a *prima facie* case of a loyalty violation, defendants would then have the burden to establish entire fairness. *See Cede v. Technicolor,* Del. Supr., 634 A.2d 345 (1993).

102(b)(7) charter provision that bars such claims. This is the end of the case.

And rightly so, as a matter of the public policy of this State. Section 102(b)(7) was adopted [66] by the Delaware General Assembly in 1986 following a directors and officers insurance liability crisis and the 1985 Delaware Supreme Court decision in *Smith v. Van Gorkom.*[67] The purpose of this statute was to permit stockholders to adopt a provision in the certificate of incorporation to free directors of personal liability in damages for due care violations, but not duty of loyalty violations, bad faith claims and certain other conduct. Such a charter provision, when adopted, would not affect injunctive proceedings based on gross negligence.[68] Once the statute was adopted, stockholders usually approved charter amendments containing these provisions because it freed up directors to take business risks without worrying about negligence lawsuits.[69]

Our jurisprudence since the adoption of the statute has consistently stood for the proposition that a Section 102(b)(7) charter provision bars a claim that is found to state only a due care violation.[70] Because we have assumed that the amended complaint here does state a due care claim, the exculpation afforded by the statute must affirmatively be raised by the defendant directors.[71] The directors have done so in

---

**66.** 65 Del. Laws ch. 289.

**67.** Del.Supr., 488 A.2d 858 (1985) (holding that directors may be personally liable in monetary damages for gross negligence in the process of decisionmaking).

**68.** *See* R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corporations & Business Organizations,* 1–11, 1–12 (3d ed.1998) (setting forth the Comment that accompanied the legislation explaining its purposes and effect); *see also* E. Norman Veasey, Jesse A. Finkelstein and C. Stephen Bigler, *Delaware Supports Directors with a Three–Legged Stool of Limited Liability, Indemnification and Insurance,* 42 Bus. Law, 399–404 (1987):

> While courts have traditionally expressed deference to the judgment of directors, the directors' views and actions have not uniformly been outcome-determinative. Flaws in the directors' decisionmaking processes have often resulted in their decisions blowing up in their faces.
> * * *
> No doubt every director of a public company is painfully aware of the celebrated damage case of *Smith v. Van Gorkom,* where directors were found personally liable in damages for gross negligence in hastily approving a merger transaction.
> * * *
> Delaware has adopted new legislation modifying indemnification rights and allowing a certificate of incorporation to contain a provision limiting or eliminating the personal monetary liability of directors in certain circumstances.
> * * *
> Section 102(b)(7) is not, and was not intended to be, a panacea for directors.
> In addition, new section 102(b)(7) does not eliminate the duty of care that is properly imposed upon directors.
> * * *
> While section 102(b)(7) may not be a panacea, it provides a layer of protection for directors by allowing stockholders to dramatically reduce the type of situations in which a director's personal wealth is put "on the line." Thus, the "the first leg" of support afforded directors under the Delaware statutory scheme is a reduction in the overall sphere of liability to which a director is otherwise exposed in acting in his capacity as such. The other two "legs" of support—indemnification rights and insurance—operate within this reduced sphere of liability.

**69.** *See* E. Norman Veasey, *Economic Rationale for Judicial Decisionmaking in Corporate Law,* 53 Bus. Law. 681, 693–94 (1998).

**70.** *See, e.g., Emerald Partners,* 726 A.2d at 1224; *Arnold v. Society for Savings Bancorp.,* Del.Supr., 650 A.2d 1270, 1288 (1994); *Zirn v. VLI Corp.,* Del.Supr., 681 A.2d 1050, 1061 (1996).

**71.** Although an exculpatory charter provision is "in the nature of an affirmative defense"

this case, and the Court of Chancery properly applied the Frederick's charter provision to dismiss the plaintiffs' due care claim.[72]

### The Aiding and Abetting Claim Against Knightsbridge

■■■ We next turn to the plaintiffs' claims relating to Knightsbridge's conduct during the auction process. They first argue that the trial court erred in dismissing their claim that Knightsbridge aided and abetted the board's alleged breach of its fiduciary duty—namely, the board's failure to obtain the highest price reasonably available during the auction. Specifically, the amended complaint alleges that Knightsbridge (1) initially misrepresented the nature of its interest in the Trusts' shares, (2) threatened to sue the board if it breached the June 1997 merger agreement, (3) demanded a hasty consummation of the September 1997 merger, and (4) conditioned the September 1997 offer on the board's acceptance of extremely restrictive contract terms.[73] The Court of Chancery rejected these arguments because the negotiations between Knightsbridge and Frederick's were at arm's-length and because the facts alleged in the complaint do not indicate that Knightsbridge knowingly participated in any fiduciary breach by the board.[74]

■■■ A third party may be liable for aiding and abetting a breach of a corporate fiduciary's duty to the stockholders if the third party "knowingly participates" in the breach.[75] To survive a motion to dismiss, the complaint must allege facts that satisfy the four elements of an aiding and abetting claim: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, ... (3) knowing participation in that breach by the defendants," and (4) damages proximately caused by the breach.[76]

■■■ In this case, we have concluded that the amended complaint does not adequately allege a duty of loyalty claim. But we have assumed, without deciding, that the amended complaint, construed most favorably to plaintiffs, alleges that the board's conduct was grossly negligent and constituted a breach of its duty of care.[77]

---

under *Emerald Partners*, the board is not required to *disprove* claims based on alleged breaches of the duty of loyalty to gain the protection of the provision with respect to due care claims. Rather, proving the existence of a valid exculpatory provision in the corporate charter entitles directors to dismissal of any claims for money damages against them that are based solely on alleged breaches of the board's duty of care.

72. *Accord In Re Lukens, Inc. Shareholders Litigation*, Del. Ch., 757 A.2d 720, *aff'd sub nom. Walker v. Lukens, Inc.*, Del. Supr., No. 623, 1999, 2000 WL 1152467, Berger, J. (July 27, 2000) (ORDER).

73. *See* July 1998 Mem. Op. at 8–9. The terms of the Knightsbridge offer are summarized *supra* note 10.

74. *See* July 1998 Mem. Op. at 9–10.

75. *Gilbert v. El Paso Co.*, Del. Ch., 490 A.2d 1050, 1057 (1984) ("It is well settled that a

third party who knowingly participates in the breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relationship.") (citations omitted); *Laventhol, Krekstein, Horwath and Horwath v. Tuckman*, Del.Supr., 372 A.2d 168, 170–71 (1976) ("[P]ersons who knowingly join a fiduciary in an enterprise which constitutes a breach of his fiduciary duty of trust are jointly and severally liable for any injury which results.") (citing *Jackson v. Smith*, 254 U.S. 586, 41 S.Ct. 200, 65 L.Ed. 418 (1921)).

76. *Penn Mart Realty Co. v. Becker*, Del. Ch., 298 A.2d 349, 351 (1972); *see also Weinberger v. Rio Grande Industries, Inc.*, Del. Ch., 519 A.2d 116, 131 (1986) (same); *Gilbert*, 490 A.2d at 1057 (same).

77. In the corporate context, "[d]irector liability for breaching the duty of care 'is predicated upon concepts of gross negligence.'" *McMullin*, 765 A.2d at 921 (quoting *Aronson*, 473 A.2d at 812).

We must therefore determine whether the plaintiffs alleged facts supporting a reasonable inference that Knightsbridge "knowingly participated" in the board's due care breach.[78]

Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach.[79] Under this standard, a bidder's attempts to reduce the sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting,[80] whereas a bidder may be liable to the target's stockholders if the bidder attempts to create or exploit conflicts of interest in the board.[81] Similarly, a bidder may be liable to a target's stockholders for aiding and abetting a fiduciary breach by the target's board where the

---

**78.** We express no view on the question whether a third party may "knowingly participate" in or give substantial assistance to a board's grossly negligent conduct or whether a third party may be liable for aiding and abetting only if the board's breach is intentional. *Compare Greenfield v. Tele–Communications*, Del. Ch., C.A. No. 9814, 1989 WL 48738, Allen, C. (May 10, 1989) ("But where the charge is conspiracy or knowing participation with a breaching fiduciary, some facts must be alleged that would tend to establish, at a minimum, knowledge by the third party that the fiduciary was *endeavoring* to breach his duty....") (emphasis added) *with* Restatement (Second) of Torts § 876 cmt. b (1977) ("If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act. This is true both when the act done is an intended trespass ... and when it is merely a negligent act....") *and People v. Abbott*, N.Y.App. Div., 84 A.D.2d 11, 445 N.Y.S.2d 344, 347 (1981) (" '[G]iving assistance or encouragement to one it is known will thereby engage in conduct dangerous to life should suffice for accomplice liability as to crimes defined in terms of recklessness or negligence.' ") (quoting Lafave & Scott, *Criminal Law*, § 64 at 511).

**79.** *See Greenfield*, Mem. Op. at *3; *Assoc. Imports v. ASG Indus., Inc.*, Del. Ch., C.A. No. 5953, 1984 WL 19833, Duffy, J. (June 20, 1984) ("[K]nowledge and intentional complicity therein by Eberstadt [the third party] of the breach by Hubbard [the fiduciary] are essential."), *aff'd sub. nom Hubbard v. Assoc. Imports, Inc.*, Del.Supr., 497 A.2d 787 (July 16, 1985) (ORDER). The court in *Greenfield* also observed: "It may be that some circumstances will arise in which the terms of the negotiated transaction themselves are so suspect as to permit, if proven, an inference of knowledge of an intended breach of trust." *See Greenfield*, Mem. Op. at *3.

**80.** *See Tomczak v. Morton Thiokol, Inc.*, Del. Ch., C.A. No. 7861, 1990 WL 42607, Hartnett, V.C. (April 5, 1990) ("Although Dow's purchases certainly had the effect of putting economic pressure on Morton Thiokol, what Dow essentially did was to simply pursue arm's-length negotiations with Morton Thiokol through their respective investment bankers in an effort to obtain Texize at the best price that it could."); *Weinberger v. United Fin. Corp. of Cal.*, Del. Ch., C.A. No. 5915, 1983 WL 20290, Hartnett, V.C. (Oct. 13, 1983) (refusing to impose liability on offeror in a tender offer who negotiated with target at arm's-length to obtain the best price possible).

**81.** *Gilbert*, 490 A.2d at 1058 ("[A]lthough an offeror may attempt to obtain the lowest possible price for stock through arm's-length negotiations with the target's board, it may not knowingly participate in the target board's breach of fiduciary duty by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders."); *Zirn v. VLI Corp.*, Del. Ch., C.A. No. 9488, 1989 WL 79963, Hartnett, V.C. (July 17, 1989) ("It can therefore be reasonably inferred that American Home was aware of the VLI directors' conflict [of interest] when it negotiated the Revised Agreement with the directors of VLI and, therefore, it was possible that American Home may have been afforded some advantage because of it."); *Gilbert*, 490 A.2d at 1057 ("By agreeing to purchase them from El Paso's directors, Burlington is chargeable with knowledge that El Paso's directors were preferring their interests to certain of its shareholders who had already tendered.").

bidder and the board conspire in or agree to the fiduciary breach.[82]

In the present case, the Court of Chancery concluded that the September 1997 merger agreement was the product of arm's-length negotiations and that arm's-length negotiations are inconsistent with participation in a fiduciary breach.[83] The plaintiffs argue that this conclusion reflected impermissible fact-finding on a motion to dismiss, but there is no indication in the amended complaint that Knightsbridge participated in the board's decisions, conspired with board, or otherwise caused the board to make the decisions at issue.[84]

Moreover, there is no dispute that only one of the Frederick's directors who approved the merger had a conflict of interest, and that director did not dominate or control the others.

Although Knightsbridge's tactics here, as alleged, may have been somewhat suspect,[85] we agree with the trial court's conclusion that the plaintiffs' aiding and abetting claim fails as a matter of law because the allegations in the complaint do not support an inference that Knightsbridge knowingly participated in a fiduciary breach.

**82.** *See Rio Grande Ind.*, 519 A.2d at 131 (asserting that civil conspiracy is "sometimes called 'aiding and abetting' " and holding that the complaint did not allege facts supporting an inference that the third party "played any role" in the defendant directors' decision not to disclose information); *Gilbert*, 490 A.2d at 1058 (denying motion for summary judgment on civil conspiracy claim because a third party bidder "may not knowingly participate in the target board's breach of fiduciary duty by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders"). Although there is a distinction between civil conspiracy and aiding and abetting, we *do not find that distinction* meaningful here. *Compare Gilbert*, 490 A.2d at 1057 ("It is well settled that a third party who knowingly participates in the breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relationship.") *with Nicolet v. Nutt. Inc.*, Del.Supr., 525 A.2d 146, 149–150 (1987) (defining a civil conspiracy as: "(1) A confederation or combination of two or more persons; (2) An unlawful act done in furtherance of the conspiracy; and (3) Actual damage.") (citing *McLaughlin v. Copeland*, D.Del., 455 F.Supp. 749, 752 (1978) *aff'd*, 3rd Cir., 595 F.2d 1213 (1979)).

**83.** *See* July 1998 Mem. Op. at 10–11. It is worth noting that some courts have held that a complaint need not allege the absence of arm's-length negotiations. *See Penn Mart*, 298 A.2d at 351 (rejecting the argument "that the plaintiff must allege either that 'the ... negotiations were not conducted at arms length (or) that IDS exerted an influence over the directors sufficient to infect their action

with vitiating conflict of interest' "); *In re Shoe–Town, Inc. Stockholders Litig.*, Del. Ch., C.A. No. 9483, 1990 WL 13475, Chandler, V.C. (Feb. 12, 1990) ("A plaintiff does not have to allege that negotiations were not conducted at arms-length or that the nonfiduciary exerted an influence over the directors.").

**84.** *Cf. Repairman's Service Corp. v. Nat'l Intergroup., Inc.*, Del. Ch., C.A. No. 7811, 1985 WL 11540, Walsh, V.C. (Mar. 15, 1985) (denying aiding and abetting claim because "there was intensive arm's-length bargaining between the parties with demands made and concessions granted on both sides" and "no indication in this record that the Bergen defendants conspired with their National counterparts to breach a duty owed to National shareholders with respect to the fashioning of the merger agreement or in the preparation or issuance of the prospectus"); *In re Shoe–Town. Inc. Stockholders Litigation*, Del. Ch., Consol. C.A. No. 9483, 1990 WL 13475, Chandler, C. (Feb. 12, 1990) (rejecting aiding and abetting claim because "[t]he complaint describes classic arms-length bargaining, not knowing participation in the breach of a fiduciary duty").

**85.** Knightsbridge's conduct in the present case was, at best, on the borderline. As discussed in more detail below, we find particularly disturbing the allegation that Knightsbridge characterized its stock purchase agreement with the Trusts as an 'acquisition' in its August 28, 1997 letter to the Frederick's board, despite the fact that Knightsbridge had only a conditional right to vote the Trusts' shares.

### The Tortious Interference Claim Against Knightsbridge

■ The plaintiffs' second claim against Knightsbridge alleges that Knightsbridge tortiously interfered with Frederick's stockholders' prospective opportunity to obtain a higher price for their shares from Veritas. The Court of Chancery dismissed this claim, holding that the plaintiffs did not have a valid business expectancy because there is "no lawful way that Frederick's could have circumvented Knightsbridge's power (and, as the majority stockholder, its right) to vote down any transaction it did not favor." [86] Although we agree with the court's conclusion, our analysis differs slightly.

■ To survive dismissal, a claim for tortious interference with business relations must allege: "(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages." [87] We apply these elements to a particular case "in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner." [88] In this case, we conclude that the complaint does not support an inference that Knightsbridge's alleged interference proximately caused Frederick's stockholders to lose the expected benefit of the Veritas' bid.

The first element raises a timing question: At what point is the probability of the business opportunity measured? By holding that there was no "valid business expectancy" because the board did not have a duty to circumvent Knightsbridge's majority voting interest, the trial court implicitly assessed the likelihood of a superior bid at a point *after* Knightsbridge acquired its majority voting stake on September 9, 1997 and *after* Knightsbridge effectively gained control over the Trusts' shares on September 3, 1997. [89]

We believe that the probability of the business opportunity must be assessed at the time of the alleged interference. In this case, the alleged interference— Knightsbridge's misrepresentation of its ownership rights and its litigation threats against the board—occurred before September 3, 1997. [90] We therefore assume, without deciding, that the complaint alleges sufficient facts supporting an inference that, at the time of the alleged interference, Frederick's stockholders could reasonably expect to benefit from the possibility of a higher Veritas offer. [91]

---

86. July 1998 Mem. Op. at 14.

87. *DeBonaventura v. Nationwide Mut. Ins. Co.*, Del.Supr., 428 A.2d 1151, 1153 (1981) (citations omitted).

88. *Id.*

89. As the Court of Chancery observed, if the probability of the business opportunity is measured at this point, the plaintiffs' claim fails because, even if the Frederick's board issued a dilutive option to circumvent Knightsbridge's interest, the September 1997 merger agreement required the Frederick's board to grant Knightsbridge any option offered to third parties. This provision effectively precludes any expectation that Veritas' $9.00 per share offer could succeed after the

board signed the merger agreement with Knightsbridge.

90. Knightsbridge sent the letter including the alleged misrepresentation of its interests in the Trusts' shares on August 28, 1997. Knightsbridge sent other letters demanding consummation of the merger at $6.90 per share and threatening litigation against Frederick's on September 1 and 2, 1997.

91. For example, the complaint alleges that Veritas pursued negotiations with Frederick's on September 3 and 5, that Veritas submitted a draft agreement on September 5, 1997, and that Veritas submitted a higher bid on September 11, 1997. In addition, the June 1997 merger agreement included a "fiduciary out"

The next question is whether the amended complaint alleged sufficient well-pleaded facts to support an inference that Knightsbridge had interfered with the stockholders' expectancy. With respect to this element of the tortious interference claim, the trial court correctly concluded that Knightsbridge's valid acquisition of a majority stake in Frederick's does not constitute interference, and its threat to enforce its rights under the June 1997 merger agreement was lawful.[92] But the amended complaint also alleges that Knightsbridge falsely asserted that it had "acquired" more than 40% of the voting stock in Frederick's and that its "approval is necessary before any transaction may be consummated." The amended complaint further alleges that Knightsbridge threatened to use its purported voting power to block competing bids. According to the plaintiffs, Knightsbridge deliberately misrepresented its voting interest in Frederick's as a means to prevent the board's acceptance of superior bids and to forestall the implementation of a poison pill defense. Although these allegations may support an inference that Knightsbridge intentionally interfered with the auction process, that is not the end of the inquiry.

The final question is whether the amended complaint adequately alleges that Knightsbridge's interference (that is, its misrepresentation) proximately caused

Frederick's stockholders to lose the expected benefit of Veritas' superior bid. This question turns on whether Knightsbridge's misrepresentation could have caused the Frederick's board to reject Veritas' higher bid in favor of the lower Knightsbridge bid.[93]

In some circumstances, Knightsbridge's alleged misrepresentation that it controlled more than 40% of the voting shares (combined with its expressed intent to block competing offers) could conceivably have influenced the board's decision to approve the Knightsbridge offer and to end the auction. But, in this case, Knightsbridge actually did acquire the Trusts' shares on September 4, 1997—two days before the board accepted Knightsbridge's September 6 offer.

Since Knightsbridge effectively remedied its earlier misrepresentation well before the board acted, we conclude that the alleged misrepresentation could have had no effect on the board's decision to accept the Knightsbridge offer. Thus, in our view, the plaintiffs' tortious interference claim fails as a matter of law because the allegations in the amended complaint do not support an inference that Knightsbridge's misrepresentation proximately caused the board to accept the Knightsbridge offer and to reject the higher Veritas offer.

permitting the board to consider superior offers by third parties.

**92.** *See Bershad v. Curtiss–Wright Corp.,* Del. Supr., 535 A.2d 840, 845 (1987) ("Stockholders in Delaware corporations have a right to control and vote their shares in their own interest. They are limited only by any fiduciary duty owed to other stockholders. It is not objectionable that their motives may be for personal profit, or determined by whim or caprice, so long as they violate no duty owed other shareholders.") (citations omitted); *see also* July 1998 Mem. Op. at 15 (citing *Bershad,* 535 A.2d at 845; *Emerson Radio Corp.*

*v. Int'l Jensen Inc.,* Del. Ch. C.A. Nos. 15130 & 14992, 1996 WL 483086, Jacobs, V.C. (1996); *Thorpe by Castleman v. CERBCO. Inc.,* Del.Supr., 676 A.2d 436, 444 (1996)).

**93.** The Court of Chancery found the complaint lacking in part because it failed to allege that Knightsbridge "induced or caused the board of Frederick's to breach its fiduciary duties ...." July 1998 Mem. Op. at 15. The presence or absence of a breach of fiduciary duty is not relevant to this analysis because a fiduciary breach is not required to show intentional interference or causation of damages.

### Conclusion

We have concluded that: (1) the amended complaint does not adequately allege a breach of the Frederick's board's duty of loyalty or its disclosure duty; (2) the exculpatory provision in the Frederick's charter operates to bar claims for money damages against the directors caused by the alleged breach of the board's duty of care; and (3) the amended complaint does not provide adequate support for the plaintiffs' claims against Knightsbridge for aiding and abetting a breach of fiduciary duty by the Frederick's board or for tortious interference with a prospective business opportunity. Accordingly, we affirm the judgment of the Court of Chancery dismissing the amended complaint against the Frederick's board and Knightsbridge.