# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

STEVEN H. BUSCH and LINDSEY LABATE, individually and on behalf of others similarly situated,

Plaintiffs,

v.

WESTELL TECHNOLOGIES, INC., THE VOTING TRUST AGREEMENT DATED FEBRUARY 23, 1994, AMONG MR. PENNY, MR. SIMON AND CERTAIN MEMBERS OF THE PENNY FAMILY AND THE SIMON FAMILY, ROBERT C. PENNY III, ROBERT W. FOSKETT, KIRK BRANNOCK, SCOTT CHANDLER, TIMOTHY DUITSMAN, CARY WOOD, MARK ZORKO, and PATRICK J. MCDONOUGH, JR.,

Defendants.

C.A. No. 2022-0346-NAC

## ORDER GRANTING DEFENDANTS' PARTIAL MOTION TO DISMISS THE VERIFIED CLASS ACTION COMPLAINT

WHEREAS:

1. Westell Technologies, Inc. ("Westell" or the "Company") is a "provider of 'high-performance network infrastructure solutions.'" Docket Index ("D.I.") 1 ("Compl.") ¶32.

2. Plaintiffs' claims in this action concern an October 2020 transaction by Westell whereby the Company effected a 1-for-1,000 reverse stock split followed immediately by a 1,000-for-1 forward stock split (the "Transaction"). *Id.* ¶¶6–7.

Westell stockholders who owned fewer than 1,000 shares immediately prior to the reverse stock split received $1.48 in cash for each share they owned at the effective time of the reverse stock split. *Id.* ¶7. As a result, these cashed-out stockholders were no longer stockholders of the Company following the Transaction. *Id.* ¶¶3, 9, 39. Following the completion of the Transaction, in October 2020, Westell took steps to delist and deregister its Class A common stock. *Id.* ¶7.

3.      In connection with the Transaction, the Company filed a Schedule 14A on August 11, 2020 (the "Proxy Statement"). As explained in the Proxy Statement, on March 27, 2020, the Company "received a notification from the Listing Qualifications Department of The NASDAQ Stock Market that the bid price for the Company's Class A common stock had closed below the minimum $1.00 per share for 30 consecutive trading days in conflict with the NASDAQ rules for continued listing." D.I. 15 ("Defs.' OB"), Ex. B ("Proxy Statement") at 17.[1] This notification informed the Company that it had 180 calendar days to regain compliance. *Id.* The Proxy Statement further provided that "[t]he primary purpose of the Transaction [was] to enable the Company to reduce the number of record holders of its Class A

---

[1] On a motion to dismiss, this Court may rely on documents incorporated by reference into, or integral to, the Complaint. *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004). In addition, at the "motion to dismiss stage, this Court may take judicial notice of publicly available facts such as those contained in filings made with the SEC," like the Company's Proxy Statement. *Higher Ed. Mgmt. Gp., Inc. v. Mathews*, 2014 WL 5573325, at *12 n.73 (Del. Ch. Nov. 3, 2014).

common stock below 300," which was "the level at which SEC public reporting [was] required, and to eliminate the expenses and time associated with being a public company." Compl. ¶36; Proxy Statement at 2.

4. The Proxy Statement also disclosed that a special committee of the Company's board of directors retained Emory & Co., LLC to provide a "fairness opinion as to the cash payment to be paid in the Transaction." Compl. ¶37; Proxy Statement at 4.

5. On August 20, 2020, shortly after the Transaction was announced, Plaintiffs served a books and records demand on the Company pursuant to 8 *Del. C.* § 220. Compl. ¶10.

6. Stockholders voted to approve the Transaction on September 29, 2020. Compl. ¶38.

7. The effective date of the Transaction was October 1, 2020. Compl. ¶39.

8. According to Plaintiffs, the Company "paid $7.2 million to repurchase approximately 4.9 million shares of the Class A common stock at a purchase price of $1.48 per share." Compl. ¶7.

9. Plaintiffs Steven H. Busch and Lindsey LaBate commenced this action on April 19, 2022. Plaintiffs' complaint asserts two direct causes of action for breach of fiduciary duty and aiding and abetting breach of fiduciary duty. Compl. ¶¶52–61.

3

10.     Plaintiffs allege, among other things, that the price paid to cash-out stockholders in the Transaction was unfairly low.  Compl. ¶56.  Citing the Proxy Statement, Plaintiffs allege that Westell is controlled by Defendants Robert C. Penny III, Robert W. Foskett, and Patrick J. McDonough, Jr. as trustees of the Penny Trust.  Compl. ¶¶4, 15.  Plaintiffs allege that Defendants caused Westell to undertake the Transaction for self-dealing purposes.  Compl. ¶¶54–56.

11.     Plaintiffs bring this litigation as a putative class action.  The Complaint defines the "Class" simply as "all others similarly situated" with Plaintiffs.  Compl. at 1.[2]

12.     Plaintiffs divide their proposed class into two subclasses, which they refer to as the "LaBate Subclass" and the "Busch Subclass."  Compl. ¶¶8–9.

13.     Plaintiffs define the "LaBate Subclass" as a putative subclass of former Company stockholders who owned fewer than 1,000 shares of stock at the time of the Transaction.  Compl. ¶9.  Plaintiff Lindsey LaBate is alleged to have owned fewer than 1,000 shares of Westell Class A Common Stock and to have been cashed out in the Transaction.  Compl. ¶13.

14.     Plaintiffs define the "Busch Subclass" as a putative subclass of Company stockholders who owned more than 1,000 shares of stock at the time of

---

[2] The "Class" is also defined to exclude Defendants and any persons related to or affiliated with Defendants.  Compl. ¶25.

the Transaction. Compl. ¶8.[3] Plaintiff Steven H. Busch is alleged to have continuously owned more than 1,000 shares of Westell Class A Common Stock and not to have been cashed out. Compl. ¶12.

15. Defendants filed a partial motion to dismiss. The motion seeks to "dismiss with prejudice all claims brought on behalf of the 'Busch Subclass' in the Verified Class Action Complaint[.]" D.I. 7.

NOW, THEREFORE, the Court having carefully considered the parties' papers and oral argument on Defendants' Partial Motion to Dismiss the Verified Class Action Complaint, IT IS HEREBY ORDRED, this 2nd day of March 2023, as follows:

1. A motion to dismiss must be granted if "plaintiff[s] could not recover under any reasonably conceivable set of circumstances susceptible of proof." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011) (citation omitted). Although the Court must examine the facts pleaded in the light most favorable to Plaintiffs, it need not "accept every strained interpretation of the allegations[.]" *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001). The

---

[3] I note that stockholders owning more than 1,000 shares were not entitled to cash for fractional shares in the Transaction. Instead, to extent those stockholders would have had fractional shares as a result of the reverse stock split, any such fractional shares were subject to the forward stock split that immediately followed the reverse stock split. "As a result, the total number of shares of the Company's Class A common stock and Class B common stock held by a Continuing Stockholder [did] not change, but their ownership percentage [] increase[d]." Compl. ¶35; Proxy Statement at 2.

Court will not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party." *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255 (Del. 2018). A claim may also be dismissed "if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law." *Malpiede*, 780 A.2d at 1083.

2.      First, I note Defendants' assertion that the Busch Subclass claims are, if anything, derivative and not direct and must be dismissed for failure to satisfy Court of Chancery Rule 23.1.  D.I. 15 ("Defs.' OB") at 23–28; D.I. 34 ("Defs.' RB") at 14–19.  Plaintiffs, however, are adamant that the Busch Subclass claims are solely direct causes of action.  *See* D.I. 31 ("Pls.' AB") at 4 ("At no time do Plaintiffs assert or even infer that the Defendants' actions harmed the Company."); *see also id*. ("To the contrary, Plaintiffs' claim the Defendants misled and 'pushed' Plaintiffs and all unaffiliated stockholders either out or to the side for their own personal gain. Accordingly, Plaintiffs' Complaint sufficiently pleads direct claims."); Hr'g Tr. at 60:5–62:17.  I will, therefore, analyze the Busch Subclass claims to determine whether they adequately state a direct cause of action.  For the reasons I explain below, they do not and therefore must be dismissed.

3.      In support, Plaintiffs argue that Mr. Busch and the other members of the "Busch Subclass":

> were harmed by Defendants' actions in effectively establishing a low ceiling for the value of the shares, and who were also harmed in connection with the Transaction by Defendants' "going dark" and delisting—and in their dispensing with the financial reporting requirements of the SEC—affording the defendants, as insiders, an enormous informational and trading advantage in that trading was now to mainly occur in "privately negotiated sales."

Pls.' AB at 2. In Plaintiffs' telling, Mr. Busch and the Busch Subclass have been "kicked to the curb, in common parlance[,]" by Defendants. Hr'g Tr. at 21:19–20; *accord* Pls.' AB at 2 ("'kicking to the curb'"); Hr'g Tr. at 25:12–13 ("thrown them to the curb"); *id.* at 55:18–19 ("[i]n common parlance . . . kicked to the curb").

4.      Defendants respond that the Busch Subclass claims are "conclusory[,]" "nonsensical," rest on unpled assertions, and contradict Plaintiffs' claims as to Ms. LaBate. Defs.' RB at 4–7. Indeed, if one were to employ the proverbial pizza-meets-wall analogy, the pizza here was itself only half-baked.[4]

5.      Consistent with this approach, Plaintiffs' briefing failed to provide much guidance as to how the Busch Subclass claims might fit under Delaware precedent. *See, e.g.*, Pls.' AB at 27-30 (Part I of Argument, titled "The Complaint Alleges a Cognizable Claim on Behalf of the Busch Subclass") (citing no case law).

---

[4] *See Auriga Capital Corp. v. Gatz Prop.*, 40 A.3d 839, 882 n.184 (Del. Ch. 2012) ("[C]ounsel should remember that it is more time-consuming to clean up the pizza thrown at a wall than it is to throw it.").

6. At oral argument, Plaintiffs' counsel attempted to clarify the nature of the claims. Counsel pointed again to the three alleged aspects of the Transaction noted above: (i) setting an "improper ceiling for the value of the shares" by disclosing a fairness opinion for $1.48 per share in connection with the Transaction,[5] (ii) "tak[ing] away the market by which Mr. Busch can trade[,]" and (iii) "tak[ing] away the informational process through deregistering and delisting." Hr'g Tr. at 22:1–8; *see also* Pls.' AB at 27("[H]aving established a ceiling of $1.48 for the value of the shares, Defendants then delisted the stock depriving the unaffiliated continuing shareholders of [ ] timely market information . . . as well as [a] liquid market for the buying and selling of stock."). Counsel further explained that I must consider the three aspects of the Busch Subclass claims together. *See* Hr'g Tr. at 25:21–26:12 ("[W]e are not arguing that delisting is improper. We're not challenging delisting. We're not even challenging the fact that they took the shares off of the market. What we are challenging is that if you look at this as an entire package . . . . It's one package. And if you have a package and the package consists

---

[5] Hr'g Tr. at 22:23–24:23 ("[O]n the last day that these shares were publicly traded, prior to the delisting, they issued a fairness opinion. They put out a fairness opinion that had two parts, basically. There was a fairness opinion from the special committee that said, this is fair and in the best interests, and there was a fairness opinion from Emory which said that they fairly valued the shares at $1.48. . . . So what we've argued, what we've pled, and we've alleged, is common sense tells you that in an arm's length transaction, there is no one with common sense who is going to go to Mr. Busch and say, ["Y]ou know what? I'm paying you $2 for your shares."); *see* Hr'g Tr. at 38.

of three parts as to the continuing unaffiliated shareholders like Mr. Busch, an improper valuation that is too low, you've taken away the market, and you've taken away the information, you have hurt people like Mr. Busch tremendously. And what we're challeng[ing] is, and what we're saying is, that that combination is deadly and that combination should not go forward.").[6]

7. Given that Mr. Busch was not cashed out in the Transaction and continues to own his Westell stock, I asked at oral argument what remedy Mr. Busch seeks. Counsel responded that a fair price should be determined for Mr. Busch's shares and that Mr. Busch be granted an option to put his shares to the Company at that price. Hr'g Tr. at 50:2–14, 53:8–54:22.[7] Mr. Busch's counsel, however, stated that he has identified no Delaware precedent in support of the type of claim advanced by the Busch Subclass. Hr'g Tr. at 47:8–48:6.

8. In lieu of Delaware precedent, counsel instead analogized the claims to (unbriefed) environmental externality concepts:

Think of it in the context of pollution. If there is a company that is polluting the waters, it doesn't have the ability to contain the damages of its pollution and say, only certain people have claims but the people downstream do not

---

[6] Mr. Busch's argument is not altogether easy to follow. Moments after saying that Mr. Busch is "not challenging delisting[,]" counsel stated that "Busch isn't really challenging the $1.48. What he's really challenging is he's challenging the going dark part or he's challenging the delisting." Hr'g Tr. at 26:16–19.

[7] *But see* Hr'g. Tr. at 50:15–20 ("THE COURT: Have you asked for that in your complaint[?] [COUNSEL]: We have not. There, you know, we've asked for what's reasonable and what's to be determined. You know, right now, we're -- I've given my answer.").

have claims. If you have committed an act that is a violation of your duty, then all individuals in this case, shareholders, who have been affected by the violative conduct have claims that ought to be sorted out through the legal process. So the question is do these people have the ability, do they have the right, to come into this court and to complain? And the answer to that question, Your Honor, is yes, they do. So we are saying that the unaffiliated continuing shareholders, those asserting claims here, are not and have never been in the same shoes as the defendants, and, therefore, their claim should continue.

Hr'g Tr. at 20:18–21:11. According to Mr. Busch, if a controlling stockholder has allegedly harmed one portion of the (former) minority stockholder base, then it follows that all minority stockholders will have a litigable claim.

9.      Mr. Busch's difficulty articulating a coherent basis for his claim is understandable given that the Transaction would have been accretive to Mr. Busch and the Busch Subclass, as continuing stockholders, if the $1.48 per share price at which the cashed-out stockholders' shares were purchased was too low. And, indeed, counsel acknowledged that, "as a matter of corporate financial and as a matter of pure economics, that's right." Hr'g Tr. at 52:3–5. Counsel asserted that was incorrect, however, "as a matter of the real world, so to speak, and how the markets work[.]" Hr'g Tr. at 52:5–6.[8]

---

[8] I note that counsel acknowledged that Mr. Busch is not asserting that Defendants had a fiduciary duty to ensure a market for his stock or seeking relief to that effect. Hr'g Tr. at 52:8–12.

10

10. I turn, then, to Defendants' argument that Mr. Busch's theory of the case rests on conclusory allegations, supplemented by attempts to amend his pleading through briefing and attorney-testimony. I agree with Defendants.

11. Assuming that the Busch Subclass claims are not derivative, they are subject to the liberal standards of notice pleading. There are limits, however, as the plaintiff's allegations should at least "put [the] defendant[s] on fair notice in a general way of the cause of action asserted[.]" *Garfield v. Allen*, 277 A.3d 296, 360 (Del. Ch. 2022) (citation omitted). I have included significant passages in this order from the hearing transcript because the Complaint is exceedingly conclusory as to the Busch Subclass claims. As Defendants rightly point out, with respect to the Busch Subclass claims, the Complaint alleges that the price at which Mr. Busch could sell his stock was "suppressed" in connection with the Transaction—and not much else. Compl. ¶56. Plaintiffs counter that they included lengthy passages from the Proxy Statement in the Complaint disclosing how the Transaction would result in the delisting of Westell's stock and the suspension of periodic reporting. That is true, but it is hard to say that the allegations give any sense, for even minimal notice-pleading purposes, of the nexus between those disclosures and the Busch Subclass claims.

12. During briefing and oral argument, counsel attempted to bolster the claims. The answering brief attempted to draw a connection between the price

suppression alleged by Mr. Busch and the delisting and suspension of periodic reporting. As Defendants point out, however, a plaintiff "cannot defeat an argument raised in a motion to dismiss by proffering an after-the-fact theory for this first time in his answering brief." *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *23 (Del. Ch. Mar. 31, 2017, *revised* Apr. 11, 2017).[9]

13. At oral argument, counsel stated that the Busch Subclass is "stuck with a horrible situation." Hr'g Tr. at 24:23–25:2. According to counsel, "[i]t is terrible, because they have thousands of shares that are basically paperweights now. It is deadweight. They are subject to private negotiations. There is no market anymore. There is no information." Hr'g Tr. at 25:2–6. None of this is alleged in the Complaint. Other than long passages copied and pasted from the pre-Transaction Proxy Statement, the Complaint—which was filed 18 months after the Transaction—failed to plead anything about the subsequent effects of the Transaction, delisting, and deregistration.[10]

---

[9] *See also MCG Cap. Corp. v. Maginn*, 2010 WL 1782271, at *5 (Del. Ch. May 5, 2010) ("[Plaintiff] could either seek leave to amend its complaint or stand on its complaint and answer the motion to dismiss. Having chosen the latter course of action, it is bound to the factual allegations contained in its complaint. It cannot supplement the complaint through its brief.") (citations omitted).

[10] If anything, the combination of extended attorney-testimony about these matters during oral argument and the absence of such allegations in the pleadings likely colors my view of whether counsel himself believes that what is pled adequately alleges a reasonably conceivable claim.

14. Defendants also argue that Mr. Busch and the Busch Subclass, as continuing stockholders, were treated the same as Defendants in the Transaction. Defs.' OB at 18–21; Defs.' RB at 11–12 (citing *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 809 (Del. Ch. 2022) ("entire fairness is not triggered by [the presence of a controlling stockholder] alone"). Further, Defendants assert that delisting and the suspension of periodic reporting is not, by itself, grounds for a claim for breach of fiduciary duty.[11]

15. Notably, neither party cited to me then-Vice Chancellor Jacobs's decision in *Hamilton v. Nozko*, 1994 WL 413299 (Del. Ch. July 27, 1994). That decision provides:

> The question is whether corporate fiduciaries commit an actionable breach of fiduciary duty if for self-interested reasons they cause the corporation's stock to be deregistered and delisted and as a result, cause the market for the stockholders' investment to become significantly impaired or eliminated. As a purely conceptual matter that question must be answered in the affirmative, if only by reason of the doctrine that corporate action, even where legally

---

[11] *See* Defs.' RB at 8-9; *see also Malone v. Brincat*, 722 A.2d 5, 11 (Del. 1998) ("In the absence of a request for stockholder action, the Delaware General Corporation Law does not require directors to provide shareholders with information concerning the finances or affairs of the corporation."); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 153 (Del. Ch. 2004) ("[F]iduciaries have no distinctive state law duty to disclose material developments with respect to the company's business.") (internal quotation marks omitted); *Wynnefield P'rs Small Cap Value L.P. v. Niagara Corp.*, 2006 WL 1737862, at *9 (Del. Ch. Jun. 19, 2006) ("Delaware law recognizes a corporate board's ability, in a proper exercise of their business judgment, to cause the corporation to take steps to deregister even if, as an incidental matter, deregistration might adversely impact the market for the corporation's securities."), *aff'd in part and rev'd in part on other grounds Niagara Corp. v. Wynnefield P'rs Small Cap Value L.P.*, 907 A.2d 146 (Del. 2006) (TABLE)).

13

permissible, will be proscribed if taken for an inequitable purpose. Such fiduciary manipulation of the corporate machinery for personal advantage would, if proven, be actionable.

*Id*. at *6 (citations omitted). In *Wynnefield Partners*, however, former-Vice Chancellor Parsons distinguished *Hamilton* on the grounds that "a board member actually attempted to purchase the company's shares at a low price following deregistration." 2006 WL 1737862, at *9.

16. Here, I agree with Defendants that Mr. Busch's assertions of self-dealing, insofar as they are relevant to the Busch Subclass, are hypothetical and asserted in a conclusory manner through briefing and statements of counsel. *See Ford v. VMware, Inc.*, 2017 WL 1684089, at *10 (Del. Ch. May 2, 2017) (allegation that defendant might engage in future wrongful conduct was "a conclusory and speculative allegation of future harm that the court need not credit"); *Solomon v. Armstrong*, 747 A.2d 1098, 1122 (Del. Ch. 1999) (declining to "entertain such transparent hypothetical abuses and the hypothetical fear of retribution and coercion"), *aff'd*, 746 A.2d 277 (Del. 2000) (TABLE). Further relevant here, is that, unlike *Hamilton*, the Transaction was *accretive* to the Busch Subclass.

17. I therefore make no judgment as to whether, in different circumstances, a continuing stockholder in a reverse-split / forward-split delisting transaction may state a cognizable claim for breach of fiduciary duty. I simply conclude that the Busch Subclass claims, as presented here, must be dismissed.

14

For the foregoing reasons, Defendants' Partial Motion to Dismiss the Verified Class Action Complaint is hereby GRANTED.

_/s/ Nathan A. Cook_
Vice Chancellor Nathan A. Cook

15