# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| DAXCO, LLC and DIAMOND PARENT, LP, | ) )  ) |
| Plaintiffs, | ) ) |
| v. | ) C.A. No. 2025-0942-DH ) |
| BENJAMIN TIMM, | ) ) |
| Defendant. | ) ) ) ) ) ) |

## REPORT

Report: January 22, 2026
Date Submitted: November 24, 2025

Stephen B. Brauerman, Justin C. Barrett, BAYARD, P.A., Wilmington, Delaware; Jonathan C. Hill, Benn C. Wilson, BRADLEY ARANT BOULT CUMMINGS LLP, Montgomery, Alabama; *Attorneys for Plaintiffs Daxco, LLC and Diamond Parent LP*.

Andrea S. Brooks, WILKS LAW, LLC Wilmington, Delaware; *Attorney for Defendant Benjamin Timm*.

**HUME, IV, M.**

Today, the Court yet again confronts two stubborn interests: Delaware's contractarian commitment to private ordering, and Delaware's disfavor of restraints on trade. Over the last decade, this Court has articulated its reluctance to automatically enforce agreements not to compete, particularly arising out of the employer-employee context. This case exemplifies the public policy interests buttressing such disfavor.

Over the course of several years, Defendant employee worked his way up to a management position overseeing sales for one of Plaintiff company's business lines. Defendant's vocational success resulted in the company granting him a profits interest in the larger entity structure, subject to vesting requirements and other contingencies usual in such arrangements. In consideration for the profits interest, the company required the employee to sign a restrictive covenant not to compete, thereby protecting myriad lines of the entity's international operations. Although the company has every right to protect proprietary information and impose reasonable restrictions that prevent an employee from directly competing with his former employer, the present restrictions are far too broad and vague. As a result, I hold that the non-competition agreement is unenforceable and grant Plaintiff's motion to dismiss. This is my final report.

## I.    BACKGROUND

Unless otherwise noted, the Court takes the following facts from Plaintiffs' Verified Amended Complaint ("Amended Complaint") and the documents it incorporates by reference.[1]

### A.    Facts

#### 1.    Daxco's Entity Structure

Daxco, LLC ("Daxco") is an Alabama LLC that provides software platforms to gyms and wellness businesses.[2] Daxco's parent company, Diamond Parent LP ("Diamond Parent"), is a Delaware LP with its principal place of business in Birmingham, Alabama.[3] Daxco has one member, Daxco Acquisition Corporation ("Daxco Acquisition"), which is organized under Delaware law.[4] Daxco Acquisition has no employees and functions as an "acquisition vehicle" for the greater Daxco organization.[5] The greater Daxco entity structure is complex, containing multiple subsidiaries. Daxco Acquisition owns Motionsoft, Inc. ("Motionsoft"), which provides member management and payment processors for

---

[1] Verified Am. Compl. for Injunctive Relief and Damages [hereinafter Am. Compl.], D.I. 26.

[2] Am. Compl., ¶¶ 9, 15.

[3] *Id.*, ¶ 10.

[4] *Id.*, ¶ 16.

[5] *Id.*

fitness facilities.[6]  Motionsoft in turn owns Conexion Club Management Solutions, Inc., a Canadian Corporation.[7]  Daxco Acquisition also owns Daxco India Technology Solutions, Private, LTD ("Daxco India"), which employs approximately 210 software developers and database administrators who support the broader Daxco software products.[8]  Daxco Parent Corporation is a Delaware Corporation that owns Daxco Acquisition.[9]

### 2. Daxco's Product Lines

Daxco provides technology to health and wellness organizations.[10]  Daxco organizes its target markets by segments: (1) the small and medium business market (SMB), such as martial arts and functional fitness gyms; (2) large nonprofit enterprises, such as the YMCA and Jewish Community Centers; and (3) the enterprise for-profit market, which includes large franchise models and multi-purpose athletic clubs.[11]  The SMB segment markets two particular products.  Zen

---

[6] *Id.*, ¶ 17.

[7] *Id.*, ¶ 18.

[8] *Id.*, ¶ 19.

[9] *Id.*, ¶ 20.  To bring the business structure full circle, Diamond Midco LP (a Delaware partnership) owns Daxco Parent Corporation.  *Id.*, ¶ 21.  Diamond Midco LP has one partner, Diamond Parent LP and Diamond Parent LP's sole partner is GI Diamond Holdings LP.  *Id.*, ¶¶ 22–23.  Daxco Parent Corporation, Diamond Midco LP, and GI Diamond Holdings LP all have no employees.  *Id.*

[10] *Id.*, ¶ 14.

[11] *Id.*, ¶¶ 26, 29.

Planner provides member management services to wellness businesses.[12] SugarWOD predominates the functional fitness market and permits gym members to track their workouts and share results with fellow gymgoers.[13]

Daxco considers its software products proprietary and zealously guards its business strategy and internal analysis of the relative strengths and weaknesses of its products.[14]

### 3. Timm's Employment with Daxco

In February 2019, Uplaunch hired Timm. Daxco acquired Uplaunch the following year, resulting in Timm's employment with Daxco as a Digital Marketing Product Specialist. Over the following five years, Timm proceeded to work his way up the ranks at Daxco. In his first role as Digital Marketing Product Specialist, Timm marketed Zen Planner. In 2022, Daxco promoted Timm to Director of Boutique Sales. In this role, Timm directed Zen Planner's worldwide sales and was privy to senior leadership discussions concerning marketing and financial strategy.[15] Daxco considers the content shared at such senior leadership meetings to be "sensitive,

---

[12] *Id.*, ¶ 26. Notably, Daxco targeted the CrossFit market with its ZenPlanner and SugarWOD products. *Id.* at ¶¶ 26-27.

[13] *Id.*, ¶ 27.

[14] *See id.*, ¶ 30.

[15] *Id.*

confidential, and proprietary."[16]   Following Timm's promotion to Director, however, Daxco did not require Timm to agree to any non-compete or non-solicitation provisions.

Two years later, Daxco promoted Timm again, now to Vice President of SMB sales.[17]  In this role, as in the director position, Timm maintained access to senior leadership meetings, including any confidential discussions of mergers and acquisitions.[18]  In compensation for his VP position, Daxco paid Timm an annual salary of $130,000 with eligibility to receive bonuses.[19]

### a. Daxco awards Timm a Profits Interest.

As additional compensation for his promotion to Vice President, Daxco awarded Timm a profits interest in Daxco via the Class P Unit Award Agreement ("Award Agreement").[20]  The agreement conferred 150,000 Class P Units to Timm contingent upon certain vesting requirements.  Over the course of five years, 10% of the award would vest in annual tranches, meaning that if Timm remained at Daxco

---

[16] *Id.*

[17] *Id.*, ¶ 31.

[18] *Id.*, ¶ 32.

[19] Def.'s Opening Br. in support of his Mot. to Dismiss [hereinafter Def.'s Opening Br.], 4, D.I. 31.

[20] Am. Compl. ¶ 33.

for five years, he could be certain that 50% of the Units would vest.[21] The remaining 50% would only vest in the event of a sale, and the degree to which these units would vest depended on valuation benchmarks met in the sale of the entity.[22]

To receive the Class P Units, Timm signed the Award Agreement, which contained as an Exhibit the Restrictive Covenant Agreement ("RCA" or "non-compete").[23] Section 3(a) of the RCA defines the scope of Timm's non-compete:

> During the Participant's Engagement and during the twenty-four (24)-month period immediately following termination of the Participant's Engagement, regardless of the reason therefor . . . the Participant will not (and will cause the Participant's Affiliates not to), directly or indirectly, whether as owner, partner, investor, consultant, agent, employee, co-venturer or otherwise, engage in, render services for or compete with, or undertake any planning to engage in or compete with, all or any portion of any business conducted or planned to be conducted by Employer or any of its Affiliates (or that is similar, related to or competitive with any such business) at any time during the Participant's Engagement or, with respect to the portion of the Non-Compete Period that follows the termination of the Participant's Engagement, at any time within the twenty-four (24)-month period immediately preceding such termination, in any geographic area in which Employer or any of its Affiliates does business at any time during the Participant's Engagement or, with respect to the portion of the Non-Compete Period

---

[21] *Id.*, Ex. 1, § 3(a). The Award Agreement named the annually vested tranches "TVUs." *Id.* In the case of a sale prior to the expiration of five years, the vesting would accelerate and Timm would receive all unvested TVUs (*i.e.*, what remains of the 50%). *Id.*

[22] *Id.* Ex. 1, § 3(b). The Award Agreement named these contingently vested units "PVUs." *Id.* The PVUs would only vest upon sale of Diamond Parent LP. *Id.* In connection with a sale, if the MOIC (Multiple On Invested Capital) was at least 2.5x, then Timm would receive 50% of the PVUs (25% of the total units), whereas if the MOIC met or exceeded 3.0x, then all the PVUs would vest. *Id.*

[23] *Id.*, ¶¶ 35–36, Ex. 1 at 12.

that follows the termination of the Participant's Engagement, at any time within the twenty-four (24)-month period immediately preceding such termination, including, without in any way limiting the foregoing, any business or venture that, directly or indirectly, creates, develops, or provides integrated member management and payment processing Software as a Service solution to customers in the health and wellness industry, including fitness centers, boutique wellness studios and non-profit health and community centers, or otherwise competes with the business of the Employer, the Partnership and/or any of their respective Affiliates, as conducted as of the applicable date and in the United States, Canada, the rest of North America, the United Kingdom, Australia, New Zealand or the rest of the world.[24]

The RCA prohibits Timm from gaining employment with any entity that "directly or indirectly" provides Software as a Service ("Saas") products in the health and wellness industry.[25] The non-compete is effective for two years following the termination of Timm's employment. Further, for any period that Daxco considered Timm in breach of the RCA, the non-compete time period would toll until the breach ceased.[26] Section 3(a) delineates the geographic scope of the non-compete to any region where Daxco or its affiliates do business.

The RCA further provided a "blue-pencil" provision where in the event a court held the RCA unenforceable due to temporal or geographic overbreadth, the RCA would remain enforceable to its newly narrowed scope:

---

[24] *Id.* Ex. 1, at Ex. A, § 3(a).

[25] *See id.*, ¶ 38.

[26] *Id.*, Ex. 1., at Ex. A, § 4(d).

8

[I]n the event that any provision of this Agreement is determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a time, too large a geographic area or too great a range of activities, that provision shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law.[27]

"Affiliates" is a defined term in the RCA: "all persons and entities directly or indirectly controlling, controlled by or under common control with such Person, where control may be by management authority, equity interest or otherwise." Thus, the RCA prohibits employment with any competitors of Daxco in addition to those of Motionsoft, Conexion Club, Daxco India, and any other entities under the control of Diamond Parent LP.

Section 5 of the Award Agreement permits Diamond Parent LP/Daxco to recover all payments made for repurchase of the Class P Units should Timm violate the RCA.

In the event that the Participant breaches any non-competition . . . Restrictive Covenants, . . . in any case whether during or following the Participant's Engagement, the Participant's Engagement will be deemed to have been terminated for Cause, including retroactively with respect to prior repurchases of vested Class P Units . . . and, in addition to all other remedies available by law or in equity, the Partnership will have the right to recover all payments made with respect to such repurchases or otherwise in respect of the Class P Units.[28]

---

[27] *Id.*, Ex. 1, § 4(c).

[28] *Id.*, Ex. 1, § 5.

9

When signing the agreement, Timm agreed to contractual provisions stating that Timm had "become personally familiar with the business" of Diamond Parent and its affiliates,[29] the opportunity to ask Diamond Parent's representatives questions about the terms of the Award Agreement,[30] and "reasonable opportunity" to consult with financial and legal advisors about the consequences of the Award Agreement.[31]

### b. Timm departs Daxco.

One year after his promotion to Vice President and receipt of the Class P Units, Timm informed Daxco of his intention to leave the company.[32] Prior to formally submitting his resignation, Timm consulted with his Daxco superiors about possible landing spots, to avoid enforcement of the non-compete.[33] Of four possible job opportunities, Daxco executives orally waived objection to Timm's employ at three locations, while maintaining that should Timm accept employment at the fourth, they would seek to enforce the RCA.[34] Daxco executives couched their

---

[29] *Id.*, Ex. 1, § 7(b).

[30] *Id.*, Ex. 1, § 7(c).

[31] *Id.*, Ex. 1, § 25(b).

[32] *Id.*, ¶¶ 51–52.

[33] *Id.*, ¶¶ 52–53.

[34] *Id.*, ¶ 53. Daxco's complaint does not state whether employment at any of the companies would have violated the RCA's terms. Under Section 6(b) of the RCA, Diamond Parent

waiver on the continued lack of direct competition by the three acceptable companies.[35]

Several days later, Timm informed Daxco of two other employment opportunities. The executives deemed one acceptable and the other violative of the RCA.[36] Finally, Timm identified eGym, a workout equipment and software supplier, as an employment opportunity.[37] Again, Daxco orally waived objection to Timm's employment there. Soon following, Timm resigned from Daxco and began working at eGym.[38]

Several months after Timm left Daxco, Diamond Parent LP exercised its contractual option to repurchase Timm's Class P Units.[39] Because approximately

---

LP could only waive breach "agreed to in writing by the non-breaching party." *Id.*, Ex. A., at Ex. 1. In their complaint, plaintiffs state that Daxco "verbally waived" objection to Timm's employment with certain businesses. *Id.*, ¶ 53. At the TRO hearing, however, Daxco's attorney clarified that the waiver was oral. TRO Tr., 6:9-12. Thus, the Daxco executives' oral waiver did not legally waive a breach but rather signified probable non-enforcement of the RCA. *See id.* at 7:2-5.

[35] Am. Compl. ¶ 53.

[36] *Id.*, ¶ 54.

[37] *Id.*, ¶ 55.

[38] *Id.*, ¶¶ 55–56.

[39] *Id.*, ¶ 33; *see id.*, Ex. 1, § 4(c). Daxco repurchased the vested units, whereas the unvested units "automatically terminate[d and were] cancelled." *Id.* at § 4(a).

10% of the Class P Units had vested after one year, Daxco made a repurchase payment of $52,241.00.[40]

### 4. Daxco learns Timm has left eGym and commenced employment at Wodify.

Sometime between April and August 2025, Timm departed eGym and began working at Wodify Technologies, LLC ("Wodify"), a technology company providing software to boutique gyms.[41]  Much like Daxco, Wodify provides SaaS products, including "payment processing, website services, mobile apps, digital marketing" and other member management services.[42]

In August 2025, Daxco employees attended the CrossFit Games in Albany, New York to staff a booth marketing ZenPlanner and SugarWOD.[43]  The CrossFit Games provide a marquee sales and marketing opportunity to companies offering products in the boutique functional fitness domain.[44]  Daxco employees spotted Timm at the games wearing a Wodify branded t-shirt and working at the Wodify

---

[40] *Id.*, ¶ 33.  Timm signed the Award Agreement on December 15, 2023, and his employment with Daxco ended "in and around April 2025."  *Id.*, ¶¶ 35, 56.  Because the TVUs vest in annual tranches, only 20% of the TVUs (10% of all outstanding Class P Units) would have vested during Timm's tenure as VP at Daxco.  *See id.*, Ex. 1, § 3(a).

[41] *Id.*, ¶¶ 56, 60.

[42] *Id.*, ¶¶ 61–62.

[43] *Id.*, ¶ 58.

[44] *See generally* Morning Chalk Up, *Sneak Peek at the 2025 CrossFit Games Experience*, Barbend (Apr. 8, 2025), https://morningchalkup.barbend.com/p/sneak-peek-at-the-2025-crossfit-games-experience.

booth.[45]  Daxco later found a Wodify Instagram post with Wodify employees, including Timm.[46] Daxco had been previously unaware of Timm's new employment with Wodify.[47]

**5.     Daxco informs Timm that he has breached the Award Agreement and seeks remedies.**

Three days after the 2025 CrossFit Games, Daxco informed Timm that his employment with Wodify breached the RCA and that Daxco would seek return of the $52,241.00 repurchase payment for the Class P Units pursuant to Section 5 of the Award Agreement.[48]

In addition to seeking return of the repurchase payment, Daxco also demanded that Timm resign from Wodify "or from any other relationship with Wodify that would violate" the RCA and Award Agreements.[49]  In response to the demand, Timm's counsel represented that Timm would not disclose any of Daxco's proprietary information to Wodify or other third parties.[50] Not satisfied with Timm's assurances, Daxco alerted Timm that it would seek to enforce the Award Agreement

---

[45] *Id.*, ¶ 58.

[46] *Id.*, ¶ 59.

[47] *Id.*, ¶ 63.

[48] *Id.*

[49] *Id.*, ¶ 66.

[50] *Id.*, ¶ 69.

and RCA.[51]  The parties being unable to resolve the dispute privately, Daxco and Diamond Parent LP brought suit before this Court.[52]

## B.    Procedural History

Daxco and Diamond Parent LP (together, "the entities") filed suit on August 21, 2025.[53]  Alongside their complaint, the entities sought a Temporary Restraining Order and Expedited Proceedings.[54]  The matter was initially assigned to Vice Chancellor Fioravanti.  On August 28, 2025, Vice Chancellor Fioravanti heard oral argument on the two motions.  The Vice Chancellor denied the Temporary Restraining Order and granted the Motion to Expedite Proceedings.[55]  Soon following, Timm filed a Motion to Dismiss for failure to state a claim under Rule 12(b)(6).[56]  In the interim, the entities filed a motion for a preliminary injunction, which Vice Chancellor Fioravanti denied without hearing argument.[57]  After the

---

[51] *Id.*, ¶¶ 70–71.

[52] *See id.*.

[53] Verified Compl. for Injunctive Relief and Damages, D.I. 1.

[54] *See* Pls.' Mot. for Temporary Restraining Order, D.I. 1; Pls.' Mot. to Expedite Proceedings, D.I. 1.

[55] D.I. 15–16.

[56] Def.'s Mot. to Dismiss Pl.'s Verified Compl., D.I. 21.

[57] D.I. 25.

plaintiffs filed their Amended Complaint,[58] the matter was reassigned to me.[59] On November 24, 2025, I heard oral argument on Timm's 12(b)(6) motion and took the matter under advisement.[60]

## II. ANALYSIS

Timm has moved to dismiss the Amended Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[61] The standard for a Rule 12(b)(6) motion is well known to the parties: "(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof." *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (internal citations omitted). The reasonable conceivability standard does not obligate the Court "to accept every strained interpretation of the [plaintiff's] allegations." *In re General Motors*

---

[58] D.I. 26.

[59] D.I. 30.

[60] D.I. 37.

[61] D.I. 31.

15

*(Hughes) Shareholder Litigation*, 897 A.2d 162, 168 (Del. 2006) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)).

The Amended Complaint contains two counts, both sounding in breach of contract. Count I seeks legal damages as relief, whereas Count II seeks injunctive relief.[62] For the reasons expounded below, I dismiss both counts.

### A. The Restrictive Covenant Agreement is Unenforceable as a Matter of Law.

Both the counts for damages and injunctive relief are dismissed because the underlying contract is unenforceable under Delaware law. Timm raises several arguments in support of his 12(b)(6) motion, including that (1) the RCA is overbroad in terms of geographic and temporal scope, (2) the RCA fails to advance a legitimate interest of Daxco and its affiliates, (3) the RCA protects business lines into which Daxco and its affiliates have not entered, and (4) the balance of the equities disfavors enforcing the RCA against Timm.[63]

This Court "closely scrutinize[s]" restrictive covenants because they are "restrictive of trade." *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 466 (Del. Ch. 1977); *see Sunder Energy, LLC v. Jackson*, 305 A.3d 723, 752–53 (Del. Ch. 2023) ("Delaware courts do not mechanically enforce restrictive covenants; instead, they

---

[62] Am. Compl., ¶¶ 73–84.

[63] *See generally* Def.'s Opening Br.

are closely scrutinized.") (internal citations omitted), *rev'd on other grounds*, 332 A.3d 472 (Del. 2024). The Court will uphold a restrictive covenant only when the following three factors are met: (1) It is "reasonable in geographic scope and temporal duration"; (2) the RCA "advance[s] a legitimate economic interest of the party seeking its enforcement"; and (3) the RCA "survives a balancing of the equities." *FP UC Holdings, LLC v. Hamilton*, 2020 WL 1492783, at *6 (Del. Ch. Mar. 27, 2020) (quoting *Lyons Ins. Agency, Inc. v. Wilson*, 2018 WL 4677606, at *5 (Del. Ch. Sep. 28, 2018)). Because restrictive covenants necessarily infringe on a party's liberty to engage in trade, the Court "take[s] into account the public interest in competition, the need for individuals to be able to earn a living, and the imbalances in bargaining power and repeat-power player experience that exist between businesses and individuals." *Sunder Energy, LLC*, 305 A.3d at 753 (citing *Elite Cleaning Co., Inc. v. Capel*, 2006 WL 1565161, at *4 (Del. Ch. June 2, 2006).[64]

### 1. The RCA's geographic scope and temporal duration is overbroad.

Timm first argues that the geographic scope and temporal duration of the RCA exceeds the limits of what this Court has enforced. I must consider how the

---

[64] As the Court noted in *Sunder*, these imbalance of power factors weigh more heavily where the employee is less sophisticated, and the entity retains the balance of power. 305 A.3d at 753 n.66. The Court considers, though does not accord dispositive weight, to the ability of both parties to bargain for and potentially exact concessions in executing an RCA.

17

breadth and length of the RCA operate together because "[t]he two dimensions necessarily interact." *Del. Elevator, Inc. v. Williams*, 2011 WL 1005181, at *8 (Del. Ch. Mar. 16, 2011). Ultimately, "the reasonableness of a covenant's scope is not determined by reference to physical distances" but instead "the area in which a covenantee has an interest the covenants are designed to protect." *Weichert Co. of Pa. v. Young*, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007).

### a. Delaware law subjects non-competes executed in the employer-employee context to heightened scrutiny.

This Court analyzes restrictive covenants under one of two regimes. In the sale of the business context, the RCA "must be tailored to the competitive space reached by the seller and serve the buyer's legitimate economic interests." *Intertek Testing Services NA, Inc. v. Eastman*, 2023 WL 2544236, at *4 (Del. Ch. Mar. 16, 2023) (citing *FP UC Holdings, LLC*, 2020 WL 1492783, at *7)). This standard is based on the relatively equal negotiating positions between buyer and seller and the sales context where both sides are contemplating conditions of the transaction. Where the RCA accompanies the sale of a business, this Court undertakes a less scrutinizing analysis. *See Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210 at *19–20 (Del. Ch. July 22, 2015) (enforcing a five-year non-compete encompassing twenty-three states in the sale of a business context); *cf. Cleveland Integrity Services, LLC v. Byers*, 2025 WL 658369, at *10 (Del. Ch. Feb. 28, 2025) (denying a preliminary

18

injunction to enforce a two-year continent-wide non-compete because it is "facially broader than necessary to protect Plaintiff's U.S. business interests.").

Outside of the sale of a business context, however, the Court undertakes a more searching inquiry. Rather than "tick through individual features of a restriction in isolation," the Court will consider the RCA "synergistically." *Sunder Energy, LLC*, 305 A.3d at 753. Under this more scrutinizing regime, the Court has declined to enforce non-competes as short as two years and a scope as small as 100 miles, due to the lack of reasonableness and proportionality in their restrictions. *See Hub Group, Inc. v. Knoll*, 2024 WL 3453863, at *8–9 (Del. Ch. July 18, 2024) (declining to enforce a one-year geographically ambiguous non-compete); *Centurion Service Group, LLC v. Wilensky*, 2023 WL 5624156, at *5 (Del. Ch. Aug. 31, 2023) (declining to enforce a nationwide non-compete). The Court carefully examines the consideration received by the employee in exchange for executing the restrictive covenants. Where the consideration is substantial, as in the sale of a business context, a longer and larger scope seems justified, whereas minimal consideration cannot support a broad non-compete. *See, e.g.*, *Centurion Service Group*, 2023 WL 5624156, at *5 (declining to enforce a nationwide non-compete because of minimal consideration where the employee was already employed at the time of signing the RCA).

19

**b.** **The non-compete is unenforceable because it seeks to protect the economic interests of Diamond Parent's Affiliates.**

The Court enforces a non-compete only where its scope is closely tailored to the employee's role within the entity. *See Hub Group*, 2024 WL 3453863, at *11 (declining to enforce a non-compete where its scope was not limited to the employee's "identical responsibilities."). Delaware permits restrictive covenants only where the enforcing entity has a "strong economic interest." *Centurion Service Group*, 2023 WL 5624156, at *5. While an entity has a strong economic interest in newly acquired assets and information obtained in the sale of a business, no such economic interest in affiliates exists in the employer-employee context. *See Kodiak Building Partners, LLC v. Adams*, 2022 WL 5240507, at *8 (Del. Ch. Oct. 6, 2022) (noting economic interests in "protection of employer goodwill and protection of employer confidential information from misuse.") (internal quotation omitted); *Fortiline, Inc. v. McCall*, 2024 WL 4088629, at *4 (Del. Ch. Sep. 5, 2024) ("A covenant including the employer's affiliates is 'not tailored to [the employee's] role while employed,' and the inclusion of affiliates in different sectors and different countries is 'not essential to the protection of [the employer's] legitimate business functions.") (quoting *Hub Group*, 2024 WL 3453863, at *9).

Daxco's non-competition provision explicitly seeks to protect the interests of Diamond Parent's Affiliates. Section 3(a) prevents Timm from competing with "all

20

or any portion of any business conducted or planned to be conducted by . . . any of [the Employer's] Affiliates," and the geographic scope of the covenant encompasses the business of the Employer's Affiliates anywhere in the world.[65]

Because the non-compete arose in the employer-employee context and the entity seeks to protect the economic interest of both Daxco and its affiliates, the language of the covenant falls squarely within the scope proscribed in *Fortiline*. Daxco has no strong economic policy interest in protecting its affiliates from competition with Timm, considering that the complaint never alleges Timm conducted work outside of Daxco's SMB line. This Court has repeatedly struck down such overbroad protective interests and does so again.

The temporal duration of the RCA coupled with its global scope is unreasonable. Under the terms of the RCA, Timm cannot "engage in, render services for or compete with . . . all or any portion of any business conducted or planned to be conducted by Employer or any of its Affiliates" for two years "in any geographic area in which Employer or any of its Affiliates does business at any time during [Timm's] Engagement" or during the two years following the termination of Timm's employment.[66] Daxco enumerates a non-exhaustive list of what it considers

---

[65] Am Compl. Ex. 1, at Ex. A, § 3(a).

[66] *Id.*

21

its areas of business operations: "any business or venture that . . . creates, develops or provides integrated member management and payment processing Software as a Service solution to customers in the health and wellness industry . . . ."[67]  In short, Timm cannot work for any entity that provides member management software in a region where Daxco currently has or plans to service clients.  The non-compete provision is not tailored to the scope of Timm's work for Daxco managing the SMB line.  Because the RCA prohibits Timm from "engag[ing] in" or "render[ing] services for" any actual or prospective competitor, the contractual language prohibits Timm from working at a company providing software to gyms in at least sixty-eight countries, even where his role is unrelated to SaaS sales.

The entities contend that the global reach of the RCA is reasonable because Daxco's business is global.  Furthermore, the scope of the RCA (sixty-eight companies) is directly tied to where Daxco claims to have recently conducted business.  Putting aside, briefly, the regions where Daxco's affiliates conduct business, Daxco paints with too broad a brush its geographic reach.  Admittedly, Daxco pleads that its "clients comprise over 10,000 facilities and 20 million members spanning 68 countries."[68]  Daxco's clients are, however, gyms and

[67] *Id.*

[68] *Id.*, ¶ 15.

22

recreational facilities. Daxco provides SaaS to myriad boutique, non-profit, and franchised gyms. Under Daxco's argument, the RCA precludes Timm from working in geographic proximity to any gym that uses one of Daxco's products.

## 2. The RCA fails to adequately describe its scope.

The geographic scope of a non-compete must be congruous with the scope of the entity's operations. *See Intertek Testing Services NA, Inc. v. Eastman*, 2023 WL 2544236, at *4 (Del. Ch. Mar. 16, 2023). In determining congruity, the Court does not demand a "perfect match" between the scope of the restrictive covenant and the entity's operations, but the entity must have "a legitimate business interest in the protected area." *Cleveland Integrity Services v. Byers*, 2025 WL 658369, at *10–11 (Del. Ch. Feb. 28, 2025). As part of protecting its economic interest, this Court expects the RCA to describe with reasonable specificity the entity's lines of business and where they operate. *See, e.g.*, *Payscale Inc. v. Norman*, 2025 WL 1622341, at *6 (Del. Ch. June 9, 2025) ("The Noncompete does not describe the lines of business in which any of those entities operate, rendering the provision unreasonably vague."). Where a non-compete protects both the employer and the employer's affiliates, the employer must justify the "broader legitimate economic interest" and demonstrate that the employee had actual knowledge of the other affiliates' scope of operations. *Eagle Infrastructure Super Holdco, LLC v. Harmon*, 2024 WL 5103919, at *3 (Del. Ch. Dec. 12, 2024); *see Ainslie v. Cantor Fitzgerald, L.P.*, 2023 WL

23

106924, at *18 (Del. Ch. Jan. 4, 2023) (noting concerns that an RCA protecting affiliates might result in "a partner . . . unknowingly engag[ing] in" proscribed behavior), *rev'd on other grounds*, 312 A.3d 674 (Del. 2024).

The RCA protected the interests of both Daxco, where Timm worked, in addition to all other affiliates in the broader Diamond Parent business structure. The RCA describes neither the nature of the work nor the scope of operations of these other affiliates, even though the agreement elevates their purported economic interests over Timm's freedom of trade. This Court's *Payscale* decision is clear: a non-compete must "describe the lines of business in which any of those [protected affiliate] entities operate," and failure to do so renders the provision "unreasonably vague." 2025 WL 1622341 at *6.

Daxco makes two arguments against the proposition that the RCA's protection of the affiliates' interest is overbroad. First, Daxco contends that Timm was "personally familiar" with the affiliates' business.[69] Second, Daxco advances that the parties require discovery to adequately determine the affiliates' operation and "the effect of those operations on the scope of the covenant occurred."[70]

---

[69] Def.'s Reply Br. in Supp. of His Mot. to Dismiss Pls.' Verified Am. Compl., 23–24, D.I. 33.

[70] *Id.* at 24.

24

The question here is whether it is reasonably conceivable that Daxco's RCA is enforceable. As applied to the question of Timm's knowledge, I frame the issue simply: is pleading Timm's knowledge of the affiliates' business sufficient to demonstrate that the geographic scope is not overbroad. Under *Eagle Infrastructure*, the employer must both (1) justify the economic interests of protecting the affiliates and (2) show the employee's knowledge of such operations. 2024 WL 5103919, at *3. While Daxco's pleading sufficiently pleads the latter point, the former remains lacking. The RCA states no more than the fact that affiliates are protected and enumerates a nonexhaustive list of countries where the RCA applies.[71]

Second, the question of the covenants' scope does not require further discovery.[72] While this Court has refused to enforce non-competes at the preliminary injunction stage, I may appropriately dispose of the case via a motion to dismiss under Rule 12(b)(6) where a pleading incorporates a facially invalid non-compete. *See, e.g.*, *Intertek*, 2023 WL 2544236, at *3 (dismissing a complaint seeking to enforce a non-competition agreement). The Court can readily ascertain

---

[71] *See* Am. Compl., ¶ 38.

[72] While arguing that the question of reasonable scope is premature Plaintiff noted that a series of decisions cited by Defendant were (1) in the context of a preliminary injunction or later and (2) authored by the "same judicial officer." Pls.' Opp'n to Def.'s Mot. to Dismiss, at 24, D.I. 32. This Court's requirement that non-competes meet a stringent standard of review prior to enforcement is not anomalous to one member of the Court. All practitioners before this Court should be wary of suggesting such pejorations in their briefing and argument.

that the RCA is overbroad in temporal duration and geographic scope, fails to describe the lines of work of the affiliates, and disproportionately favors Diamond Parent's economic interests at Timm's expense. The Court need not delve into fact-specific questions—such as Timm's knowledge of the scope of operations—when other attributes of the RCA render it invalid.

### 3. It is not reasonably conceivable that a balancing of the equities would support enforcement of the non-compete.

In determining whether a restrictive covenant is enforceable the Court balances the "employer's interest against the employee's interests." *FP UC Holdings, LLC v. Hamilton*, 2020 WL 1492783, at \*6 (Del. Ch. Mar. 27, 2020). The Court will decline to enforce the RCA where "on balance, to do so would impose an unusual hardship on a former employee." *Norton Petroleum Corp. v. Cameron*, 1998 WL 118198, at \*3 (Del. Ch. Mar. 5, 1998). Such analysis attends to the reasonableness of bargained-for consideration when executing the non-compete. *Compare Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at \*20 (Del. Ch. July 22, 2015) (enforcing a five-year, twenty-three-state non-compete in the sale of a business context where purchaser paid $4 million), *with Payscale, Inc. v. Norman*, 2025 WL 1622341, at \*5 (Del. Ch. June 9, 2025) (declining to enforce a non-compete because the profits interest granted as consideration was "vanishingly small compared to that received for the sale of a business . . . .").

26

The presence of adequate consideration underpins Delaware's rationale to subject non-competes executed in the sale of a business context to less searching inquiry. *See, e.g.*, *Derge v. D&H Fueling Solutions, Inc.*, 2025 WL 3511065, at *5 (Del. Ch. Dec. 8, 2025) ("[R]estrictive covenants in connection with a sale are typically negotiated by parties with equal bargaining power, in circumstances where the restricted person has received material consideration for her promise not to compete."); *O'Leary v. Telecom Resources Service, LLC*, 2011 WL 379300, at *5 (Del. Super. Jan. 14, 2011) (holding that a four-year non-compete is reasonable where "[t]he Plaintiffs received substantial consideration for the sale of their business and compensation as employees with the prospect of much more for both.").

Where an employee receives stock as consideration for the restrictive covenant, however, the equities tend to fall in the employee's favor. *See FP UC Holdings*, 2020 WL 1492783, at *7. In both *FP UC Holdings* and *Payscale*, the employee received a profits interest or stock units as consideration for the non-compete. While such consideration is not inadequate *per se*, the presence of remote vesting interests diminishes the adequacy of consideration when balanced against the restriction on trade that the employee is subjected to. *See FP UC Holdings*, 2020 WL 1492783, at *7 ("[T]he record here lacks any evidence that [the employee] received substantial consideration in exchange for his commitment not to work in

27

[the employer's] industry anywhere in the United States. This raises the concern that [the employer] significantly ratcheted up [the employee's] non-compete restrictions in exchange for token consideration.").

Although the procedural posture of a Motion to Dismiss precludes consideration of an evidentiary record, it is not reasonably conceivable that Timm's profits interest comprises adequate consideration for the geographically broad non-compete. After all, the profits interest vested in tranches and Timm could only expect to receive 50% of the total units, assuming he continued working at Daxco for five years. The remaining 50% of the units would only vest upon sale of the entities with certain financial benchmarks met, a standard Timm could neither expect nor guarantee. The consideration that Timm received—the vesting 50% tranches and the non-guaranteed contingent 50% portion—does not reasonably buttress a two-year, worldwide agreement not to compete within 50 miles of ubiquitous fitness businesses that use Daxco products. Thus, in keeping with this *Payscale* decision, I hold that the profits-interest does not meet the "substantial consideration" test necessary to uphold a broad non-compete.

**B. The Court declines to blue pencil the non-compete.**

While Delaware courts have discretion to blue pencil an overly broad restrictive covenant, "[T]he court's decision to exercise that equitable power should be based on the [restrictive] covenants themselves and the circumstances

28

surrounding their adoption . . . ." *Sunder Energy, LLC v. Jackson*, 332 A.3d 472, 490 (Del. 2024). In *Labyrinth, Inc. v. Urich*, the Court exercised its equitable discretion to blue pencil the agreement, in view of the sale of the business context, lack of "disparate bargaining power," and the fact that the parties "hotly and at length negotiated" the non-compete. 2024 WL 295996, at *24 (Del. Ch. Jan. 26, 2024). In *Payscale*, however, where the parties to the non-compete were employer and employee and no such parity of bargaining power existed, the Court declined to blue pencil the agreement. 2025 WL 1622341 at *7.

Because Daxco employed Timm, by nature of the employment relationship the parties possessed unequal bargaining power, and the RCA did not accompany the sale of a business, the facts fail to warrant the Court's blue penciling the agreement. The pleadings allege that Timm was an employee who gradually worked his way up the ranks of Daxco, ultimately accepting a promotion to a senior sales management position in an affiliate and executing the non-compete in exchange for some contingent stock. Daxco's acknowledgement that it informed Timm he had the opportunity to obtain counsel does not plead the existence of bargained-for exchange among equally positioned parties. *See Payscale*, 2025 WL 1622341 at *7 ("Nor does the Amended Complaint allege facts suggesting that the parties enjoyed equal bargaining power, or even that the Restrictive Covenants were negotiated.").

29

## III. CONCLUSION

Because the non-compete is unenforceable, the Court recommends that the Defendant's motion to dismiss is GRANTED and Amended Complaint is DISMISSED.  This is my final report, and exceptions may be filed under Court of Chancery Rule 144.